Hanson et al. v. Eustace's Lessee.

### ORDER.

---

WILLIAM R. HANSON, JOSEPH L. MOSS, ISAAC PHILLIPS, JOSEPH M. MOSS, AND DAVID SAMUEL, PLAINTIFFS IN ERROR, v. LESSEE OF JOHN H. EUSTACE.

A refusal to produce books and papers under a notice, lays the foundation for the introduction of secondary evidence of their contents, but affords neither presumptive nor *prima facie* evidence of the fact sought to be proved by them.

Where the fact sought to be proved by the production of books and papers, is the existence of a deed from one of the partners of a firm to the firm itself, secondary proof, that an entry existed on the books of a transfer of real estate to the firm; that an account was open, in them, with the property; that the money of the firm was applied to the consideration of the purchase; that the persons who erected new buildings on the property were paid by the notes and checks of the firm, which buildings were afterwards rented in the name, and partly furnished through the funds of the partnership, and that the taxes were paid in the same way, is not sufficient for the presumption of a deed by a jury, as a matter of direction from the court.

Nor are the jury at liberty, in such a case, to consider a refusal to furnish books and papers, as one of the reasons upon which to presume a deed; and instruction from the court which permits them to do so, is erroneous.

THIS case was brought up by writ of error from the Circuit Court of the United States, holden in and for the eastern district of Pennsylvania. It was an ejectment brought by Eustace, a citizen of the state of Virginia, against the plaintiffs in error, for two pieces of property in the city of Philadelphia; particularly described in the declaration. One of them fronted sixty-six feet upon Chestnut street, being upon the west side of Schuylkill Seventh street, and the other was on the westerly side of South Sixth street, between High and Chestnut streets, fronting twenty-five feet on Sixth street, nearly the whole of the lot being covered with a large building. The plaintiff below, Eustace, claimed title under a sheriff's sale; the defendant, Hanson, also claimed title under a public sale, but made under the authority of the assignees of R. and I. Phillips, who had become insolvent. Eustace alleged that the whole of the proceedings, both before and after the insolvency, were void on account of fraud; and that, this being so, there was nothing to impair his own title. The firm of R. and I. Phillips, which carried on a very extensive commercial business, in Philadelphia, was composed originally of Robert Phillips and Isaac Phillips. After the death of the former, which occurred, as will be hereafter stated, the partners were Isaac Phillips and Joseph L. Moss, who continued to use the same partnership name.

In April 1830, Isaac Phillips was regularly naturalized as a citizen of the United States.

On the 9th of June, 1832, Herring and wife conveyed to Robert Phillips, in fee, the property in Sixth street.

In December, 1833, Robert Phillips died, intestate; Isaac being then in Europe. John Moss, whose daughter Isaac had married,

entered a *caveat* at the office of the probate of wills, to prohibit any one from taking out letters of administration upon his estate.

On the 29th of August, 1834, three several persons conveyed each a lot upon Mulberry street, or Arch street, being called by either name, (the three lots being adjoining to each other, and making in the whole sixty-six feet,) to Sarah Moss Phillips, wife of Isaac Phillips, subject to the payment of a ground rent therein mentioned.

In September, 1834, Isaac Phillips entered into a contract with one Linck, a house carpenter, to build a house for him on the lot just mentioned in Arch street, and agreed to pay said Linck $20,000 for it, in the manner stated in the contract.

On the 1st of January, 1835, R. and I. Phillips leased the property in Sixth street to one Saint for four years; R. and I. Phillips agreeing to assist in furnishing to the amount of $1000, which was to be refunded by Saint in the first year, after which Saint was to pay $1600 per annum as rent.

On the 9th of June, 1835, Thompson and wife conveyed to Isaac Phillips, his heirs and assigns, the Chestnut street property, subject to the payment of an annual ground-rent of $272 per annum; and subject also to the payment of a mortgage debt of $3500.

On the 22d of June, 1835, Phillips, having purchased the ground-rent thus reserved upon his lot, received a deed for it from the then owner, paying $4533 33.

On the 30th of January, 1837, the register issued a notice to John Moss, stating that, in consequence of his *caveat*, no letters of administration had been taken out upon the estate of Robert Phillips, whereby the collateral inheritance tax was unattended to, and the commonwealth was suffering

On the 4th of February, 1837, letters of administration were granted to Isaac Phillips, who gave the required bond and security.

On the 13th of February, 1837, R. and I. Phillips wrote to Eustace, instructing him to draw on them at ninety days for $30,000 or $40,000, and to send sterling or French bills.

On the 4th of March, 1837, Eustace drew a bill of exchange, dated at Richmond, upon R. and I. Phillips, payable fifteen days after date to the order of Henry Thassall, for $9085 92, which was accepted by the drawees.

On the 20th of March, 1837, Joseph L. Moss conveyed to David

Samuel certain property therein mentioned, situated on Walnut street, for the sum of $7000.

On the 22d of March, 1837, Isaac Phillips and Joseph L. Moss, composing the firm of R. and I. Phillips, made a conveyance to Joseph M. Moss and David Samuel, reciting that the parties of the first part had been compelled to suspend payment, and conveying to the parties of the second part "all and singular the joint and several property and estate of the said parties of the first part, and of each of them, real and personal, situate, lying and being, or due, owing or belonging to them or either of them, within the state of New York," upon trust to pay certain persons therein mentioned. This deed was verified and recorded in New York, on the 23d of March.

On the 24th of March, 1837, Joseph L. Moss executed a warrant of attorney, to confess judgment in favour of John Moss, for $48,000, conditioned for the payment of $24,600.

On the 25th of March, 1837, David Samuel re-conveyed to Joseph L. Moss the same property which Moss had conveyed to him on the 20th of March.

On the 27th of March, 1837, a judgment was entered up, in the District Court for the city and county of Philadelphia, in favour of John Moss, against Joseph L. Moss, for the sum of $48,000, in conformity with the warrant of attorney just referred to.

On the 10th of April, 1837, Isaac Phillips conveyed to John Moss the life-estate which he derived from being tenant by the curtesy, in the Mulberry street property, which has been heretofore mentioned as having been conveyed to Sarah Moss Phillips, wife of the said Isaac, on the 29th of August, 1834. This property was subject to a ground-rent of $231 per annum, but is understood to be considered in Pennsylvania as a fee. The consideration received by Isaac Phillips is stated to have been $7102 17.

On the 27th of May, 1837, Joseph L. Moss executed to John Moss, a bill of sale of sundry articles of furniture, valued at $3950, to pay in part the judgment which had been entered, on the 27th of March, against the said Joseph L. Moss.

On the 3d of June, 1837, Isaac Phillips executed to Joseph M. Moss a bill of sale of certain furniture, in consideration of $5707.

On the 22d of June, 1837, Isaac Phillips, and Sarah his wife, and Joseph L. Moss, and Julia his wife, executed a deed to Joseph M. Moss and David Samuel, assigning their property generally, and par-

ticularly describing the two pieces of property which are the subjects of the present suit, upon certain trusts. After providing for preferred creditors, the deed directed the trustees to pay and satisfy in full, or rateably, all the other creditors who should, on or before the 21st day of August, 1837, at twelve o'clock, noon, and if resident in Europe, on or before the 20th of October, 1837, at twelve o'clock, noon, execute and deliver to the said R. and I. Phillips, a full, valid, and general release. The trust was accepted.

On the 8th of July, 1837, the property thus conveyed was valued by appraisers, appointed by the Court of Common Pleas, at $139,373 69. The Chestnut street property was valued at $15,000, and the Sixth street property at $20,000.

On the 2d of October, 1837, Phillips and Moss separately petitioned for the benefit of the insolvent law of Pennsylvania, but did not execute an assignment of their property to trustees. Two of the creditors opposed their discharge, but on the 19th of October their opposition was withdrawn, and Phillips and Moss were severally discharged.

On the 17th of November, 1837, Isaac Phillips, as the administrator of Robert Phillips, represented to the Orphans' Court that the said Robert, at the time of his death, was seised in fee of the Sixth street property; that he owed the petitioner the sum of $35,473 35, and prayed for an order to sell the property. Whereupon the court, on due consideration, granted the prayer of the petitioner, and awarded an order of sale accordingly.

In December, 1837, an action was brought by the Farmers' Bank of Virginia against Phillips and Moss, trading under the firm of R. and I. Phillips, in the District Court of the city and county of Philadelphia, upon the bill of exchange drawn upon them by Eustace as before mentioned.

On the 19th of January, 1838, Isaac Phillips, as administrator of Robert, reported to the Orphans' Court, that he had, on the 26th of December, sold the Sixth street property to David Samuel and J. Mora Moss, assignees of R. and I. Phillips, for $22,500, which sale was duly confirmed.

On the 22d of January, 1838, a judgment was entered in the District Court against R. and I. Phillips, at the suit of the Farmers' Bank of Virginia for the sum of $9541 58, subject to the defendants' discharge under the insolvent laws of Pennsylvania.

On the 30th of January, 1838, Isaac Phillips, as administrator of Robert, executed a deed for the Sixth street property, to David Samuel and Joseph Mora Moss, assignees of R. and I. Phillips, which was ratified and confirmed by the Orphans' Court.

On the 19th of March, 1838, a *fieri facias* was issued upon the judgment obtained in March, 1827, by John Moss against Joseph L. Moss, for $48,000, the proceedings upon which were set aside on the 5th of May for irregularity.

On the 11th of May, 1838, Eustace filed a bill in equity, in the Court of Common Pleas against R. and I. Phillips and their assignees, claiming that the proceeds of certain notes and bills should be specifically applied to the payment of his, the said Eustace's, claim.

On the 12th of May, 1838, an *alias venditioni exponas* was issued upon the judgment in the case of John Moss against Joseph L. Moss, and on the 4th of June the sheriff sold to John Moss, for $150 the interest of Joseph L. Moss in the Walnut street property.

On the 8th of June, 1838, the judgment which the Farmers' Bank of Virginia had obtained against R. and I. Phillips was entered for the use of Eustace, upon which a *fieri facias* was issued on the 12th of September. The sheriff levied upon several pieces of property, amongst which were. the two which are the subject of the present suit, viz., the Chestnut street and Sixth street properties.

On the 29th of September, 1838, the subject of the insolvency of Phillips and Moss was brought before the Court of Common Pleas, which passed an order permitting the petitioners to sign the assignments annexed to their petitions, and directed the date of said assignments to be filled up, as of that day ; and that the time from which said assignments should take effect should thereafter be determined by the proper authority : and the court refused to alter the appointment of assignees, made at the time the petitioners were sworn and discharged, to wit, in the term of December, 1837. The trustees gave bonds on the same day.

From September, 1838, to April 24th, 1839, there were five writs of *venditioni exponas* issued on the judgments which the Farmers' Bank of Virginia had against R. and I. Phillips, all of which writs and the proceedings under them were set aside for irregularity. On the 24th of April, a *pluries venditioni exponas* was issued. But before the sale was made, viz., on the 30th of April, 1839, the assignees of R. and I. Phillips sold at public sale, at the Philadelphia Ex-

change, the Chestnut street and Sixth street properties to William R. Hanson, one of the defendants in the suit below, and one of the present plaintiffs in error, at the following prices, viz., the Chestnut street property for $16,000, and the Sixth street property for $20,500. Both properties were advertised as clear of all encumbrances, title indisputable. At the sale the following notice was read.

"Bidders will please take notice that the property on the north side of Chestnut street, 42 feet west of Schuylkill Seventh street, being 66 feet front, by 158 feet deep; and also that on the west side of Delaware Sixth street, between Market and Chestnut streets, formerly known as Rubicam hotel, have been levied upon as the property of the late firm of R. and I. Phillips, and are actually advertised by the sheriff; and that the right of the assignees of R. and I. Phillips to convey any title to either of said properties is disputed and denied.                                   C. FALLON."

On the 10th of May, 1839, the assignees executed deeds to Hanson for the Chestnut street and Sixth street properties.

On the 20th of May, 1839, the sheriff, under the last writ of *venditioni exponas*, issued in the case of the Farmers' Bank of Virginia against R. and I. Phillips, set up and exposed to public sale several pieces of property, amongst which were the Chestnut street and Sixth street properties, for which Christopher Fallon became the highest bidder and purchaser.

On the 22d of June, 1839, the sheriff executed a deed of the above to Fallon, who, on the 11th of September conveyed them to Eustace, the plaintiff, in the suit below.

In October, 1839, Eustace brought an ejectment to recover possession.

The cause came on for trial in October, 1840. The facts stated above were established by proof, and evidence farther offered to show that the property in Sixth street was recognised by the firm of R. and I. Phillips as partnership property; that an account was opened with it on the books, and the taxes paid by the firm. On the part of the defendant, evidence was offered to show that, at the time of the death of Robert Phillips, there was another brother living besides Isaac, who was called Samuel, and also that two children of a third brother, named Lawrence, were living; that the Walnut street property was not included in the assignment, because it was thought

that the encumbrances upon it were so heavy as to destroy its value as property.

In an early stage of the trial, the counsel for the plaintiff gave notice to the defendant to produce the books and papers belonging to the firm of R. and I. Phillips.  After the testimony was closed, the court called on the plaintiff's counsel to proceed to address the jury, at which time a large number of books were brought into court, said to be the books of R. and I. Phillips, and the inspection of them was offered to the plaintiff's counsel; but the court said it was too late, and they would not permit time to be taken up in that stage of the case.

The court having delivered a charge to the jury, a verdict was found by the latter for the plaintiff; but the following exceptions were taken to the charge:

" Mr. Joseph L. Moss and Isaac Phillips, the defendants in the judgment, have been divested of all their interest, either by their voluntary assignment in June, 1837, and the proceedings under the insolvent act in October following, or the sheriff's sale in May, 1839. They can set up no title adverse to the plaintiff, and though the assignment in June may be perfectly valid, they have no right to retain possession, unless, perhaps, with the assent of the assignees, under their title, as distinct from theirs.  Mr. Joseph M. Moss and David Samuel have no legal estate in the property; their deed to M. Hanson divested their interest in May, 1839 ; they have, therefore, in themselves, no right to retain possession ; though, if they are in possession, they may defend, under the assignment, and the title of M. Hanson, as a purchaser from them, unless such privity exists between them and the defendants in the judgment, as prevents them from setting up an outstanding title—a question, which is not very important in this case, and might rather tend to make it more complicated than is necessary, by discussion."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

" It is farther objected to the plaintiff's right, that having accepted a judgment, subject to the discharge of the defendants under the insolvent law, he took it, subject to all its incidents and effects, whereby he can come upon the property of the debtors only as a

general creditor, on an equal footing with all others, through the intervention of the trustees, or in their name. This is, however, not the true construction of the agreement; it means that by confessing judgment, the defendant waived no rights or exemptions, which accrued to him by the discharge; it left him free to claim freedom from arrest on any process on the judgment, or any other right secured by the law; but it left the plaintiff at liberty to pursue any property which had belonged to the defendants, by a proceeding adversary to a purchaser under him, or any assenting creditor. If, notwithstanding any previous assignment, either voluntary or under the insolvent law, there was any property to which his judgment could attach, there was nothing in the assignment or its legal effects which prevents the plaintiff from pursuing it by legal process, till by its consummation by a sheriff's sale and deed acknowledged, he put himself in a position to assert his pretensions in a court of law, or which could, in any manner, compel him to come in under either assignment, or lose his debt.

"As a judgment creditor, he might contest with the assignees under the voluntary assignment, the validity of their title, or that of any person claiming under them, or the right of the trustees under the insolvent assignment; and if he could defeat the right thus claimed, the property was open to his claim, if he could establish it. In endeavouring to do so by this suit, we think he is not acting inconsistently with the terms on which the judgment was confessed; the defendants disclaim all interest in the property from the time of their first assignment, and are, therefore, not competent to question the plaintiff's right to try title with others. On a contrary construction, he would be compelled to acquiesce in the exclusion from the benefits under the assignment, by not having released in time; or if it was inoperative, to come in only as a general creditor for his rateable proportion of the available effects of the insolvents. We think this objection is not sustained."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

"It is next objected, that the plaintiff is precluded from contesting the validity of the assignment of June, 1837, by having filed a bill in equity, admitting its effect, and claiming under it, on the same principle which binds a creditor who takes his dividend under it.

That principle is undoubtedly a sound one, but we cannot perceive its application to this case.

" The bill states the fact of an assignment—its acceptance by the assignees—their action under it, with the consequences of such action on the equitable rights of the plaintiff; without affirming or denying the legal efficacy of the assignment, he alleges that the assignees have made, or are about to make a disposition of certain specified notes, in violation of an agreement between the plaintiff and the assignees, prejudicial to his interest and rights. He asks the court to interfere, for the purpose of protecting him from the effects of the assignment, to prevent the assignees from diverting the notes or their proceeds from the purposes agreed upon by the assignors before the assignment; he avers this agreement to be binding on the assignees, who are not authorized, on principles of equity to apply this fund to the purposes of the assignment. It is consequently a disaffirmance of the terms and conditions prescribed by the assignors—a claim to the whole of the notes and proceeds, for his own sole benefit, in opposition to the claims of every other creditor. The whole bill is founded on the equitable obligation and duty of the assignees to apply this portion of the assigned effects, contrary to the express terms of the assignment, on the ground that for the causes alleged, the law of equity controls its effect, and must regulate their distribution of the funds. On these principles the equitable claim of the plaintiff to this portion of the personal property assigned, is as adverse to the assignment as his legal claim to the real estate in controversy. The difference between the two claims is this: in the bill in equity the plaintiff avers the delivery of the notes to the assignees—that they were payable to, and endorsed by Robert and Isaac Phillips—that having then come to their hands, his remedy to recover possession of the unpaid notes, or the proceeds of those which are paid, is in equity. Whether his remedy is at law or in equity, is for the court, before whom the bill is pending, to decide ; the object of a suit in either court would be the same ; the question in both must be—in whom is the right to the notes or their proceeds—as it is in this case, in whom is the right of possession to the real estate? In the one case the validity of the assignment in passing the right to these notes to the creditors under the assignment, is as much contested by the plaintiff as it is in the other ; the fact of an assignment is admitted in both, but the plaintiff takes different modes of avoiding its effects.

" Having accepted and acted in execution of the trust, the assignees cannot deny the validity of the assignment; the law places their action under the supervision of a court, to whom the plaintiff applies for the application of a specific fund to his exclusive benefit, notwithstanding the contrary application by the assignees, under the requisitions of the assignment.

" Had the plaintiff resorted to a court of equity for a remedy as to the land in controversy, in virtue of his sheriff's deed, he must have stated his case, as he has done in his bill in equity in relation to the notes, praying for a reconveyance of what was not sold, an account for, and payment of what had been sold, on the ground that the property did not pass in equity by the assignment, and that in the hands of the assignees, it remained subject to his paramount right as a creditor attempted to be defrauded by it. Broader ground might be taken in the latter than in the former case; the plaintiff might rest his claim to the notes, on the principles of equity implanted in his case, without an allegation of fraud in fact, while he might put his claim to the land on every ground of fact, law, and equity, which his case covered; but when his object is to paralyze the assignment, either as to the notes or land, he cannot be held to affirm or claim under it.

" So long as he claims adversely to the terms and conditions upon which the assignees must act pursuant to the assignment, he may, according to the nature of his case, apply to a court of equity, to compel them to execute the trust, according to their legal and equitable obligations; or apply to a court of law, on the ground that the assignment passed no legal right to personal or real property. In resorting to a court of equity in one case, and a court of law in the other, the plaintiff is at liberty to choose his ground in affirming or disaffirming the legal effect of the assignment in creating a trust. The assignees are precluded from a choice; they have fastened on themselves a trust, either for the assenting or dissenting creditors, which the appropriate court will carry into execution, according to its settled principles. As the trust may be a legal or equitable one, its execution is enforced at law or in equity; as to one portion of the assigned property, the proper remedy may be at law, and as to the other, in equity; yet the pursuit of one can be no bar to the other, unless the grounds respectively assumed are wholly incompatible. A creditor who asks for such an execution of a trust as puts him in

the same situation as if a trust never existed, and defeats the objects intended to be effected by the creation of the trust, by directing the subject of the trust from those for whom it was designed to himself, cannot be said to claim a benefit from the trust, or to affirm what he disaffirms. By pursuing this course, he gives up no right which he could assert at law, by invalidating the instrument creating the trust —his objects are the same; the results of a decree in equity, or a judgment at law, are the same, when his rights are established to the same extent as they existed before the assignment, or as if it had never been made. Should the plaintiff obtain a decree in his favour, as to the notes and their proceeds, he thus far annuls the assignment, that it no longer impairs his rights, and is used by a court of equity as the mere instrument for the purposes of justice, and a conduit to the equitable jurisdiction which it exercises over the trustee. Should he obtain a judgment at law, an execution gives him all the fruits of a decree in equity—the different modes of proceeding being but the varied means of effecting the same object. We are, therefore, of opinion, that the filing and pending of the plaintiff's bill in equity does not, in law, impair his rights to proceed by ejectment to recover the property now in dispute, any more than bringing and prosecuting the present action would prevent him from prosecuting his bill in equity. This objection must consequently fail."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

"Another objection to our entering on an investigation of this case is founded on the decisions of the Supreme Court of this state, in the case of Fassit v. Phillips, which it is said established the validity of this assignment, and is obligatory on this court, on the principles which it has adopted and acted on uniformly. We cannot so view it. That was a bill in equity, praying for an injunction against any proceedings under the assignment, on account of its invalidity for the causes set forth in the bill, being acts of alleged fraud on the part of Joseph L. Moss, one of the assignors; an injunction was granted, but on the coming in of the answer, there appeared a positive denial of fraud, and of every fact on which the equity of the plaintiff depended. A motion to dissolve the injunction was made and heard on the bill and answer alone; the court dissolved the injunction, the only effect of which was, that assuming the answer to be true, as the

court were bound to do in the then state of the case, all action upon it was suspended till evidence was taken, and the cause came to a final hearing, when it will be competent for the plaintiff to disprove the answer, and support the allegations of his bill. In the mean time, the merits of the cause remain as open as before; the injunction was granted on the *prima facie* case stated in the bill and exhibits, but as the whole equity of the plaintiff was denied, the *prima facie* case was rebutted, whereby the parties now stand as if the court had not acted on the bill; an interlocutory order, in granting an injunction, or taking it off, has no effect on the rights of either party at the hearing. The facts set up or denied in the answer, can neither be considered as established or negatived; for the purposes of the motion to dissolve the injunction, the answer was taken as true; it has performed its office, leaving its future effect dependent, in the opinion of the court, on the effect of opposing evidence on the part of the plaintiff. Had the decisions of the court been made on a hearing of the cause on the pleadings, exhibits, and evidence, it would have been entitled to great weight in our mind, and yours, on the facts before them, and perhaps conclusive on matters of law; certainly so, if their decree had been founded on any state law, statute or common, which was local, and not in conflict with the laws of the Union."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

"It has also been contended, that whatever may be the effect of the assignment of June, 1837, on the rights of the parties, or if it is wholly void, the estate of the assignors passed to the trustees appointed by the court, on the discharge of Moss and Phillips, under the insolvent law of 1836, by the force of the law and the discharge, from the time of the filing the petitions for the benefit of the act, so that there was no interest in the defendant on which the judgment under which the plaintiff claims could attach. If this position is well taken, it takes away all right in either the plaintiff, the assignees, or Mr. Hanson to the property in controversy; for if it is still vested in the trustees for the benefit of all the creditors of the insolvent, without any assignment made by them, then as the trustees have made no conveyance, the plaintiff's judgment was no lien on their rights; and if the assignment of June, 1837, is void, Mr. Hanson has no right.

" As this position is founded on the words of the thirty-fourth section of the insolvent act, it becomes necessary to examine its various provisions, in order to ascertain the intention of the legislature in this particular.

" By the first section, the courts of common pleas have power to grant relief to insolvent debtors, ' on application made in the manner hereinafter provided.' Purdon, 508.

" Sect. 2. ' The jurisdiction of the said court must be exercised as follows, and not otherwise,' viz.: ' by sect. 9, the petitioner must present a statement of his estate, effects, and property, debts due by him, &c.;' by sect. 12, he must exhibit a true account of his debts, credits, and estates, and shall satisfy the court that he has neither concealed or conveyed, for his own use, or for any of his family or friends, or whereby to expect any future benefit to him or them, any part of his estate, effects, or credits.

" Sect. 13 directs, that if he shall be entitled to relief, he shall take an oath that he will deliver up, and transfer to his trustees, for the use of his creditors, all his property, debts, rights, and claims, &c.; that he has not given, sold, or intrusted any part of his property, rights, or claims, to any person, whereby to defraud his creditors, or any of them, or to receive or expect any profit, benefit, or advantage thereby.

" Sect. 14. ' The petitioner shall thereupon execute an assignment of all his estate, property, and effects whatever,' to such trustees as may be nominated by his creditors, or appointed by the court.

" Sect. 15. When such assignment shall have been executed, the court shall make an order of discharge; and then follows the thirty-fourth section, enacting that, ' The trustees appointed as aforesaid, shall be deemed to be invested with all the estate and property of the insolvent, at the time of filing his petition, subject to existing liens, and the trustees shall take possession of such property and estate, and may sue therefor in their own names, as well as for debts and things in action, to which there are these provisoes: 1st. That no purchase or assignment of real estate in the county, made *bona fide* for a valuable consideration, before the assignment, to any person not having actual notice of the petition, shall be impeached thereby. 2. Nor if situated out of the county, if so sold or assigned before the recording of the assignment in the other county. 3. Nor a sale of personal property to any person, not having actual notice of the petition or assignment. 4. Nor if any person pays a debt, or delivers

property to the insolvent, without actual notice, shall he be liable to pay or deliver the same to the trustees.

"Sect. 36. 'If any insolvent shall, prior to such assignment, have conveyed any part of his property to his wife and children, or either, or to any one in trust for them, or have conveyed to any other person with intent to defraud. creditors, the trustees shall have power to recover and dispose of the same, as fully as if the insolvent had been seised or possessed thereof at the time of the assignment.'

"From this summary view of the law, it is evident that the legislature intended that an assignment should be made before a discharge; the sections subsequent to the fourteenth are predicated on the supposition that it had been made, and their most important provisions will become a dead letter, if none is made, especially the thirty-sixth. By referring to the preceding act of 1814, it appears that no assignment was requisite; but as the act of 1836 is an entirely new system, superseding the old, its requisitions cannot be overlooked.

"The fourteenth section is peremptory, that an assignment shall be executed; and the fifteenth, in terms, makes the discharge dependent on its having been done; the making the estate vest before the assignment, or without one, is restoring the law of 1814, by entirely annulling the provisions of the fourteenth and fifteen sections of the new act, and making it impossible to carry the thirty-sixth section into effect by any other construction than substituting petition for assignment. We are aware of no rule or principle of law which justifies such construction by the force of the thirty-fourth section; it must be taken in connection with the other parts of the law, so as to make the system consistent in all its parts, unless its words exclude all construction and reference, which in our opinion they do not; on the contrary, they contain a reference which makes them in perfect harmony with what precedes and follows. Thus, in the fifteenth section, 'the trustees appointed as aforesaid,' necessarily refers to the fourteenth section, by which they became trustees in virtue of the assignment; they are the persons to whom the court direct it to be made; its execution is the prerequisite to a discharge by the very words of the fifteenth section, and is the only mode in which the petitioner can comply with the oath prescribed in the thirteenth section.

"Had the law used the term assigns, instead of trustees, there could have been no doubt they are the persons to whom the debtor swore he would deliver and transfer all his property, debts, rights, and claims, in the thirteenth section, to whom he was bound to execute

an assignment by the fourteenth, on which alone the court could discharge by the fifteenth, or give such effect to their order made after the assignment, as declared in the sixteenth section. They are assignees to all intents and purposes; as such they became trustees; but however named, their character, powers, rights, and duties are the same, and were complete without the thirty-fourth section, to vest in them the estate of the petitioner at the time of the assignment; but the legislature thought proper to make provision for transfers and conveyances of the estate and effects of the insolvent, between the filing the petition and the execution of the assignment, which was the object of the thirty-fourth section, and not to repeal any preceding provision, or to dispense with the assignment.

" Hence its true construction is, that the assignment, when made, shall relate to the filing of the petition, so as to cut out all intermediate dispositions by the debtor, except in the cases provided for in the thirty-fifth section, which are exceptions to the thirty-fourth, by way of a proviso, limiting its effect. Such construction gives effect to the thirty-sixth section, according to its words, which it cannot have, if there has been no assignment, while it is in harmony with every preceding provision, as well as in effectuating the intention of the legislature in requiring the execution of an assignment before discharge. We cannot think it the meaning of the law, that a debtor should be discharged who has made no assignment; that there should be trustees who were not assignees, or that the oath of the petitioner need not be complied with, as to the act specially enjoined to be done as the basis of all subsequent action by the court or trustees.

" There is another important view which must be taken of this law. In conferring power on the Court of Common Pleas to grant relief, the first section applies only to an application made in the ' manner thereafter directed ;' the second section directs that the jurisdiction of the courts ' may be exercised as follows, and not otherwise ;' this section is, consequently, a limitation on jurisdiction, so far as it applies. These words are broad enough to extend to all the provisions of the law ; it is certainly no strained construction to hold, that they apply to those acts which are positively directed to be done, before any subsequent action can be had pursuant to the law ; and if such should be its ultimate construction, that the requisites prescribed are matters on which jurisdiction depends, the consequences may be very serious and alarming. We do not mean to say that such is the true inference to be drawn from the words of the law, or de-

sire to be the first to give them a judicial exposition; our duty is to await the course of the courts of the state, and to follow it, unless the exigency of a case requires us to take the lead. We can decide all questions which have arisen under this law, without inquiring into the jurisdiction of the Court of Common Pleas, on the cases of the parties in this case; we can, with perfect consistency, hold that the estate of the insolvent does not pass to the trustees, without an assignment, so as to cut out the lien of a judgment rendered after the discharge, but before an assignment executed; and at the same time hold the judgment, or order of discharge, to be perfectly valid for all the purposes declared by the law. So we take this law as applicable to this case; the omission to make the assignment before the discharge does not impair its effect in protecting the debtor, but it leaves the parties free to assert their respective rights—the plaintiff as a creditor by original right or by assignment, and Mr. Hanson as a purchaser, notwithstanding the provisions of the thirty-fourth section. Other considerations tend to the same conclusion. The words of the thirty-fourth section are, ' all the estate and property of the insolvent, at the time of filing his petition,' which cannot apply to the property in question, because the assignment made in June preceding divested the assignors of the whole estate and property, whether it was valid or void, as against creditors. If it was valid, all the right of the assignors passed to the assignees; if it was void as to the creditors, it was good between the parties, and all others, except the creditors who were intended to be defrauded, or whom it might tend to defraud. As to them and them alone, the assignors are held to be vested in trust, without any other right, or for any other purpose, than making the property subject to debts. So that in any event there was no interest or right which the assignor could pass to the trustees for all the creditors, either by operation of law under the thirty-fourth section, or by an assignment under the fourteenth.

" The thirty-fourth section provides only for the case of an insolvent having property at the time of his petition, which he had not before conveyed; it is wholly silent as to the case of his having conveyed or assigned to his wife, children, or in trust for them, or to any other person, with intent to defraud creditors; such case is provided for by the thirty-sixth section, when the insolvent has made an assignment to trustees previous to his discharge. By making this distinct, substantive provision, the law clearly excludes such conveyance and transfer from the operation of the thirty-fourth section; thereby making a clear distinction

between the property which had never been transferred before the discharge, and property had been so transferred contrary to law. Whether, then, we look to the provisions of the insolvent law in connection, or the words of the 34th section alone, we are fully satisfied that an assignment by the insolvent at some time previous to the discharge, is necessary to vest his estate in the trustees, so as to prevent a subsequent judgment from becoming a lien. This section, then, does not affect the plaintiff's case, as contended by the defendants; the judgment may attach, notwithstanding the discharge, if we assume, as we do at present, that no assignment was made before the 29th September, 1838, after the plaintiff had made a levy; an assignment was then made, and this brings up the construction of the 36th section, which provides that when a conveyance is made prior to such assignment to defraud creditors, the trustees shall have power to recover the estate so conveyed. It follows, that if they do recover it, it must be distributed among all the creditors in the same manner as if the insolvent had been seised or possessed of it, at the time of such assignment. So construed, this section would take the property in controversy from Mr. Hanson, as a purchaser under the assignment of June, 1837, however fair his purchase may have been; it is very analogous to the enacting clause of the 13th Eliz., without the aid of the 6th section of that statute; there is no proviso to except a purchaser for valuable consideration without notice of the fraud between the assignors and assignees. There is, indeed, no declaration in terms, that the fraudulent conveyance shall be void, but it is done in effect by declaring that the trustees may recover and dispose of what has been so conveyed, 'as fully and effectually' as if the insolvent had actually been seised at the time of the assignment, which to all intents and purposes annuls the fraudulent conveyance, and takes the estate from the purchaser under it, as would the 13th Eliz., but for the exception in the 6th section.

" Literally construed, it would also destroy the lien of plaintiff's judgment, and any right founded on it, other than this rateable proportion of the general effects of the insolvent; giving it this effect, the 36th section would supersede the 13th Eliz., the common law on which it is founded, and deprive the creditor, who was attempted to be defrauded, of rights which have been unquestioned for two hundred and seventy years. It has never been doubted, that a creditor who takes measures for avoiding a fraudulent conveyance of real or personal property, by levying on and buying it under his judgment, or

a stranger who is such purchaser, shall hold and enjoy the property for his own use; and we cannot believe it was intended by the act of 1836 to uproot the whole system of jurisprudence which has grown out of the 13th Eliz., or that it is the fair construction of the provisions of the 36th section. In our opinion, they apply to a case where no creditor having previously acquired a lien or right to property fraudulently conveyed, the trustees proceed to invalidate the conveyance; and that it does not apply where the property is in the hands of a *bona fide* purchaser for valuable consideration, without notice of the fraud before the assignment made by the insolvent. We will not be the first to so construe a state law, which will produce the most mischievous effects on a long settled system of jurisprudence.

" We have been asked to consider the assignment as having been made before the discharge, but the insolvent record shows the contrary—it shows the form drawn up, unsigned, and without date; the actual execution by the order of the court on the 29th of September, 1838, as of that date, together with the refusal of the court to give it a retrospective effect to the time of the discharge or petition. This was the proper course to pursue, leaving it to be thereafter decided what was the legal effect of the proceeding, when it should be brought in question.

" There are cases where a court may order that an act be done presently, and to take effect as if done before, but the cases are few; the power is a delicate one, which ought to be used with extreme caution, so as to do no injustice to third persons, or in any way prejudice their rights; when it is intended to be exercised, it should be done in clear terms, and an entry thereof made of record—it is even then viewed with much jealousy, and is never favoured—vide 2 Peters, 521, &c. In this case it may well be doubted whether the Court of Common Pleas could give to an assignment actually made in September, 1838, the effect of taking away the lien of a judgment rendered in January preceding, and which the judgment creditor had followed up by a levy, while the assignment remained unexecuted; that court very properly refused to make such order, and this court will not consider that as having been done, which was not intended, and ought not to have been done. 2 Peters, 522, 523."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

" Having disposed of these objections, we now proceed to another, which was much pressed during the trial—that the plaintiff had not shown a legal title to the property in controversy, so as to enable him to recover in this action. As this objection presents questions of fact, as well as of law, we must refer to the evidence of title, which has been exhibited by the plaintiff, as direct proof of its being in him in virtue of the sheriff's sale, together with the principles of law by which the evidence must be applied.

" A legal title is the right to real estate, derived from the original owner of the soil, and passed to the party claiming it by deed, will, descent, or legal process operating as a deed by force of a law.

" An equitable title is one acquired without a regular deed or formal conveyance of any description, which a court of law considers as a transfer of the estate of one to another; but a title so acquired, as in equity, justice, and good conscience to vest the beneficial interest—the real and substantial ownership of the property—in the person claiming it. In such a case, a court of equity, whose appropriate and peculiar jurisdiction is to act upon the conscience of the person who holds the formal or legal title to the property, compels him to convey it to the person to whom he is bound in good conscience to make a complete title, thus uniting form to substance.

" As when B sells to A, for a price which is paid by A, who takes possession and makes valuable improvements, but B holds the title, and refuses or neglects to make a deed, A is the real owner in equity, but B is the owner in law, and the contract of purchase is by the most solemn articles of agreement under seal, with covenants to make a deed on payment of the purchase-money. B may turn A out of possession by ejectment in a court of law, because such courts cannot recognise merely equitable titles. But a court of equity would prevent B from following up his legal right, and order him to convey it; such is the course and settled rule of this court, though in the courts of this state, A might successfully defend himself in an ejectment. State courts act in the same case, and at the same time, as a court both of law and equity, which we cannot do, as the courts of the United States are, by the Constitution and laws, organized on common law principles; and though we have full common law and equity jurisdiction, we must exercise it in distinct capacities, as judges or chancellors, as the nature of the case may require.

" There are, however, cases where a court of law will not inquire whether the title of a plaintiff is legal or equitable; a tenant will not

Hanson et al. *v.* Eustace's ·Lessee.

be allowed to dispute the title of his landlord while he holds under him ; a defendant in a judgment cannot contest the title of one who holds a sheriff's deed under a sale on the judgment, nor any person who holds possession under them, by privity arising after the judgment ; in all such cases the plaintiff will recover possession, so that this objection cannot be made by Mr. Joseph L. Moss or Isaac Phillips.

" So where both parties claim under the same title, neither is bound to trace theirs beyond the common source, or to show any other right than what appears there ; the court will not inquire whether such title is legal or equitable. The right of possession depends on the question—in which party the title is invested. Thus, in the present case, both parties claim the right of possession to the Chestnut street lot, under George Thompson's deed to Isaac Phillips. It is, therefore, not necessary for the plaintiff to show the nature of the title of Thompson, or to trace it through the title-deeds to the first owner ; the only contest between the parties being—to whom the right conveyed to Phillips has passed—and neither can call on the other for the exhibition of any other title than that under which both assert the right of possession. As to the house in Sixth street, the case may be different, if the assignees have any claim to it, by any other than the title of J. L. Moss and Isaac Phillips, or Mr. Hanson is clothed with the character he assumes, or claims by a title adverse or independent. He has assumed the position of a *bona fide* purchaser, for a valuable consideration, without such notice as the law requires ; if this position is well taken, Mr. Joseph M. Moss and David Samuel can have no interest in either piece of property, or be actors in the suit in opposition to the plaintiff in any other than a derivative right, as before stated.

" Claiming under the assignment of June, 1837, under the Orphans' Court sale, or under Mr. Hanson as a purchaser from them, their possession, if they had any, on the service of the writ, must be rightful or wrongful, as the case may be in evidence ; it is, however, clear, that in their own right, by the assignment, they cannot controvert the title of Isaac Phillips and Joseph L. Moss, or call on the plaintiff to produce any other. Whether they do claim under the Orphans' Court sale, how or what they do or can claim by it, will be considered hereafter ; any claim they can have under Mr. Hanson depends on the nature of his title, and how he has a right to claim, and does claim the property.

"If he is clothed with the character he assumes, that of a purchaser of the title of Robert Phillips, in virtue of the Orphans' Court proceedings, the deed of Isaac Phillips to the assignees, and theirs to him, by a right adverse to the title of the assignees, as conveyed by the assignment, Mr. Hanson may rely on it in opposition to the equitable right of the assignors, as a distinct, independent right, passing to him in virtue of the judicial proceedings, and not in virtue of the assignment. But if he does not stand as the purchaser of an adverse title, but claims under the assignment, through the deed of the assignees founded upon it, he cannot contest the title of. the assignors, even if he assumes another position as a purchaser, which is this: a purchaser from the assignees, *bona fide,* for a valuable consideration, without any notice of any fraud in the assignment. Conceding for the present, that in this position he might hold the property, though the assignment was fraudulent, he neither need, or could contest the title under which he claimed; for such as it was, his purchase would protect him from all the consequences of fraud between the assignors and assignees, unless it was affected by the plaintiff's judgment and proceedings upon it.

"The only position, therefore, in which Mr. Hanson can set up a title adverse to that of J. L. Moss and Isaac Philips, or call on the plaintiff for any other, is as a purchaser under the Orphans' Court sale; considering him at present as so standing; the present question for consideration is, whether the legal title of the Sixth street lot was in the heirs of Robert Philips, or in Joseph L. Moss and Isaac Phillips, as the firm of R. and I. Phillips, at the time of the judgment in January, 1838,

"The plaintiff may show a legal title, without producing a deed from Robert Phillips to R. and I. Phillips; being a purchaser at sheriff's sale, he is not supposed to have the title-papers, or bound to produce, or to account for them; it is sufficient if he can prove that a deed once existed, or if he can prove such facts as will authorize a jury to presume that one had been made, if notice was given to those in whose possession it is presumed to have been, to produce it at the trial."

And thereupon the defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

"In an ordinary case, the jury must decide from the evidence before them, what facts have been proved; but in this case there is

Hanson et al. *v.* Eustace's Lessee.

one feature which is rather unusual, and to which it is necessary to call your special attention, as a matter which has an important bearing on some of its prominent points.   Timely notice was given by the plaintiff's counsel to the counsel of the assignors and assignees, to produce at the trial the books of R. and I. Phillips; no objection was made to the competency of the notice—they were called for, but were not produced till the day after the evidence was closed, and at the moment when the court had called on the plaintiff's counsel to address the jury.   No reason was assigned for their non-production, save the reference to the illness of Mr. Moss; but Mr. Phillips was in court; notice was given to Mr. Hanson, though none was necessary, as the books could not be presumed to be in his possession. That they could have been produced before the evidence on both sides was closed, can scarcely be doubted, when so many were produced afterwards.   Their production, then, was no compliance with the notice; the plaintiff could not, without leave of the court, have referred to them; he was not bound to ask it, and had a right to proceed, as if they had not been produced.

"Mr. Hanson had a right to call for the books; claiming by an adverse title, he might have moved the court for an order to produce them, but he made no effort to procure them; we say so, because there was no evidence that he did in any way endeavour to have them produced, although the court, in their opinion on the motion for a nonsuit, plainly intimated the effect of their non-production.

"There has, therefore, been no satisfactory or reasonable ground assigned for their having been kept back, and the plaintiff has a fair case for calling on you to presume, whatever the law will authorize you to presume as to the contents of the books.   On this subject the fifteenth section of the Judiciary act has made this provision: 'That all the said courts of the United States shall have power, in the trial of actions at law, on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases, and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery; and if a plaintiff shall fail to comply with such order to produce books or writings, it shall be lawful for the courts, respectively, on motion, to give the like judgment for the defendant, as in cases of nonsuit; and if a defendant shall fail to comply with such order to produce books or writings, it shall be lawful for the courts, respectively, on

motion as aforesaid, to give judgment against him or her by default.'
This enables courts of law to apply the same rules and principles,
where papers or books are withheld, as have been adopted by courts
of equity, which are these, in our opinion, as long since expressed in
Askew *v.* Odenheimer, 1 Baldwin's Rep. 388, 389."

And thereupon the said defendants further excepted to the follow-
ing matters or propositions of law contained in the said charge to the
jury, to wit:

"It must not, then, be supposed that the only effect of the sup-
pression or keeping back books and papers, is to admit secondary
evidence of their contents, or that the jury are confined, in presuming
their contents, to what is proved to have been contained in them; a
jury may presume as largely as a chancellor may do, when he acts
on his conscience, as a jury does, and ought to do, and on the same
principles.

"Mr. Bridges states that he believes there is an entry on the books;
of the transfer from Herring to Robert and Isaac Phillips, but don't
know how the transfer was made. It is in proof, by the clerks of
Robert and Isaac Phillips, that an account was open on their books
with the Sixth street lot; that the money of the firm was applied to
the payment of the consideration money to Herring; one of the per-
sons who erected the new building says he was paid by the notes
and checks of the firm; a tenant proves that Joseph L. Moss rented
it in the name of the firm, who furnished it to the amount of $1000,
and the tax collectors prove the payment of taxes by the firm. In
opposition to this evidence, the defendants offer nothing; the books
of the firm are suppressed, when they could and ought to have been
produced; and the sole reliance in support of the title of Robert
Phillips, is the deed from Herring. If you believe the witnesses,
Robert Phillips never was the sole and real owner of this property on
the first purchase; and if you think the facts stated are true, you may
and ought to presume, that if the books had been produced, they
would have shown that the payment of the whole purchase money,
and the whole expense of the improvements made on the lot, were
paid by the firm; that it formed an item of their joint estate, and was
so considered by the partners. You may, also, and ought to presume,
that the production of the books would have been favourable to the
plaintiffs, and unfavourable to the defendants, in any other aspect as
bearing on the ownership of this property. On such evidence we
would, as a court of equity, hold that there was such a clear equitable

title in the firm, that Robert Phillips, or his heirs, were bound, on every principle of justice, conscience, and equity, to make a conveyance, so as to make that title a legal one. And when it appears that the members of the new firm had conveyed it in trust for creditors, as their joint property, that the grantees had accepted the conveyance, and sold the property under the assignment; that the purchaser from them had accepted a deed reciting theirs, and no other title, we cannot hesitate, as judges in a court of law, in instructing you that you may presume that such a conveyance from Robert Phillips, or his heirs, has been made, as they were bound in equity and good conscience to make.

" Legal presumptions do not depend on any defined state of things; time is always an important, and sometimes a necessary ingredient in the chain of circumstances on which the presumption of a conveyance is made; it is more or less important, according to the weight of the other circumstances in evidence in the case. Taking, then, all in connection, and in the total absence of all proof of any adverse claim by Robert Phillips, or his heirs, from 1832, every circumstance is in favour of the presumption of a conveyance; and we can perceive little, if any weight in the only circumstance set up to rebut it, which is the proceedings in the Orphans' Court. You will give them what consequence you may think they may deserve, when you look to the time and the circumstances under which they were commenced, carried on, and completed by a sale for $22,500, which counsel admit was not paid, and also admit that the sole object was to extinguish the mere spark of legal right remaining in Robert Phillips, or his heirs, and not because he or they had any beneficial interest in the property. If there was lawful ground for presuming the existence of a conveyance from him, or them, before November, 1837, we should think that any thing accruing afterwards was entitled to no weight in rebutting such presumption: and were we in the jury box, we would think it operated the other way. It was for the interest of the assignees and assenting creditors to consider the conveyance as not made; for if it had been made previously, a non-assenting creditor to the assignment might take it under a judgment, as was done by the plaintiff, and thereby hold it, if the assignment did not pass the title; whereas, by taking the deed as not made, the Orphans' Court sale would vest the title in the assignors, and leave no legal right on which a judgment against Joseph L. Moss and Isaac Phillips could attach. As, however, this is a matter entirely for

Hanson et al. v. Eustace's Lessee.

your consideration, we leave it to your decision, with this principle of law for your guide: that on a question whether a conveyance shall be presumed or not, the jury are to look less to the direct evidence of the fact than to the reasons and policy of the law, in authorizing them to infer that it was made if the party who was in possession of the legal title, was bound in equity to convey to the real, true, equitable owner. This legal presumption is not founded on the belief alone that the fact existed, but much more on those principles which enforce justice and honesty between man and man, and tend to the security of possessions which have remained uninterested and undisturbed. Should your opinion be in conformity with ours on this point, you will presume that there was a deed from Robert Phillips, or his heirs, competent to vest the title to the Sixth street lot in the firm of Robert and Isaac Phillips—that it so remained at the time of the assignment, and that it was by such conveyance as would enable them to enjoy the property against Robert Phillips and his heirs."

And thereupon the said defendants further excepted to the following matters or propositions of law contained in the said charge to the jury, to wit:

"Should you think otherwise, you will find accordingly; but even then your finding would not affect the merits of the case, because Mr. Hanson, or those under him, cannot make the objection of the want of a legal title, unless he stands firm in the position he assumes—that of a *bona fide* purchaser for valuable consideration, without notice, such as the law requires.

"There are two classes of purchasers of this description.

"First. Those who are thus referred to, and the requisites to clothe themselves with such character prescribed by the Supreme Court of the United States, in Boom v. Chiles, in 10 Peters, 210 to 212. 'It is a general principle in courts of equity, that when both parties claim by an equitable title, the one who is prior in time is deemed the better in right; 7 Cranch, 18; 18 T. R. 532; 7 Wheat. 46; and that where the equities are equal in point of merit, the law prevails.' This leads to the reason for protecting an innocent purchaser, holding the legal title, against one who has the prior equity; a court of equity can act only on the conscience of a party; if he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. Sugden on Vend. 722. Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser

who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it; and when 'in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief, 9 Ves. 30–34, which a court of equity imparts liberally. Such suitors are its most especial favourites. It will not inquire how he may have obtained a statute, mortgage, encumbrance or even a satisfied legal term, by which he can defend himself at law, if outstanding; equity will not aid his adversary in taking from him the *tabula in naufragio,* if acquired before a decree.

"But this will not be done on mere averment or allegation; the protection of such *bona fide* purchase is necessary only when the plaintiff has a prior equity, which can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money, and receiving the conveyance without notice, and a clear conscience.

"Second. Those who claim the character of purchasers under the 6th section of the 13th Eliz., the requisites of which are thus defined by the law: 'That this act, or any thing therein contained, shall not extend to any estate or interest in lands, tenements, hereditaments, leases, rents, commons, profits, goods, or chattels, had, made, conveyed, or assumed, or hereafter to be had, made, conveyed, or assumed, which estate or interest is or shall be upon good consideration and *bona fide* lawfully conveyed or assumed to any person or persons, or bodies politic or corporate, not having at the time of such conveyance or assurance to them made, any manner of notice or knowledge of such covin, fraud, or collusion as is aforesaid; any thing before mentioned to the contrary hereof notwithstanding.'

"Our first inquiry must be, whether Mr. Hanson comes within the first class of such purchasers, by any evidence he has adduced.

"He claims the Chestnut street lot under the title of Isaac Phillips, by the deed of the assignees, as the estate of Isaac Phillips, without any claim by any outstanding legal title. As to this property, then, he does not come within the first class; he relies exclusively on the deed of Thompson to Isaac Phillips, the assignment, and the deed of the assignees. He claims the Sixth street lot under Robert Phillips, and not Isaac Phillips, and adduces, as evidence thereof, the following chain of title:

"The deed from Herring; the Orphans' Court proceedings; the sale under them; the deed from Isaac Phillips, the administrator, to

Joseph M. Moss and David Samuel, on the 30th January, 1838, and the deed of 10th May, 1839, (made by them pursuant to the public sale to Mr. Hanson, on the 30th April, preceding,) recorded on the 23d May, 1839, and there rests his case as to the adverse title of the Sixth street lot, as one distinct from the Chestnut street property. On inspecting the deed for the Sixth street lot, there is found no reference to the title of Robert Philips, or the Orphans' Court sale; the whole recital of the title is the assignment of June, 1837, and there is no other covenant in the deed than against the acts of the grantors, who execute the deed as assignees; and not as purchasers from Isaac Phillips, of the title of R. Phillips, in virtue of the Orphans' Court proceedings.

"No evidence is offered of any agreement, or even intention to sell, or purchase, any other than the title which passed by the assignment; so that there is no obligation, legal, equitable, or moral, on the assignees, to make any conveyance of the right of Robert Phillips, unless Mr. Hanson can affect them with some fraud, or show some accident or mistake under which he accepted the conveyance. The form of this deed is in substance the same as the deed for the Chesnut street lot; the recital of the assignment the same, and both made in the capacity of assignees. There seems no one feature of difference between the two purchases, which can make one refer to the title of Robert, and the other to Isaac Phillips; and if you believe the evidence of Mr. Blackstone, there is one fact in evidence which goes strongly to prove that he neither purchased, or intended to purchase any other title than what his deed purported to convey. Mr. B. says, that after the ejectment was served on him, he had a conversation with Mr. Hanson, and expressed some doubt about paying the rent; to which Mr. Hanson replied that the property was his, he had purchased it at auction, under the best legal advice. If this was so, and he had purchased the title of Robert, and not Isaac Phillips, or that of the firm, it is scarcely credible that he would not have been advised to at least take a deed with a reference to, and recital of that title, and that he would not have done so; on the contrary, he took a deed in the form it appears, and claimed exclusively under it. By reference to the auction sale, it appears that there was no notice of the title of Robert Phillips, but the title under the assignment was stated to be good, and the sale made under it. In the absence of all explanatory evidence, the legal construction of the deed is, that it conveyed, and purported to convey no other than the

Hanson et al. v. Eustace's Lessee.

title of the assignors, and that no legal presumption can be made that any other right passed, especially when it does not appear that Mr. Hanson had, at any time before this trial, claimed under the Orphans' Court sale, or the title of Robert Phillips. On this ground alone, Mr. Hanson has failed to bring himself within the principles established by the Supreme Court, as necessary to constitute a purchaser of the first class: and there are other circumstances in the case equally conclusive to exclude him. Vide 10 Peters, 211, 212.

"We are next to consider his character as a purchaser at the assignees' auction sale of the title which is claimed to have passed by the assignment.

"The evidence of his filling this character is his bid at the auction, his acceptance as a purchaser, and the deed from the assignees, its record, his possession of the property, and claim of title by the purchaser; but no evidence is offered of the actual payment of any money, independently of the recital of the deed and the receipt at the foot of it, which is for the whole consideration, while the counsel of Mr. Hanson distinctly admit before you, that only one-third has been paid. There is, therefore, no pretence set up that any more was actually paid, or that the recital of the deed, or the admission in the receipt is correct; but we do not think proper to put this part of the case on the admission of counsel, as they might fairly contend that the admission should be received as made, whereby the payment of one-third would be taken as part of the admission, or the whole be disregarded. It is better and safer to take the case as the law considers it, independently of any admission, and according to well-established principles, as applicable to a purchase set up under the circumstances in evidence, of an estate in lands, conveyed 'upon good consideration, *bona fide* lawfully conveyed, to a person not having at the time of such conveyance any manner of notice or knowledge of such covin, fraud, or collusion' as is recited in the law. You will observe, that by the preamble and enacting clause of the English statute, all conveyances, bonds, judgments, &c., made with intent to hinder, delay, or defraud creditors, are declared actually void, although the person who accepts of them is no participator in the fraud; it is a sweeping, general denunciation of such acts as unlawful, having no effect as against the person designed to be defrauded, but good between the parties and all others; the consequence whereof is, as we have heretofore held, that the fraudulent grantor remains the legal owner of the property, not because his deed

is not binding on him, or his heirs, but the law has put it out of his power to divest himself of property, by a deed designed to defraud creditors; he therefore holds the legal title in trust for his creditors, and for the purpose of applying it to the payment of his debts, is as fully the legal owner after the conveyance as before, though as to all others the estate is in the fraudulent grantee. 1 Baldwin, 356.

"Such is the effect of the enacting part of the statute, which would not protect the fairest of purchasers for the want of any words limit-ing or qualifying its imperative terms, and precludes any construction or exception; but the sixth section operates as an exception in the case provided for, which is a conveyance, &c., designed by the grantor to defraud creditors, but in which the grantee has in no way participated, or had any notice or knowledge of any fraud before the conveyance—Magniac v. Thompson, 7 Peters, 389, &c. Mr. Hanson claims to be a purchaser of this description from the assignors under the assignment, and in virtue of the proviso in the law, claims to be protected; although the assignment was fraudulent between the parties, the question now to be considered is, whether, if the assignment be void, he can be in a better situation than the assignors; in deciding which, it must be assumed that the assignment is void as to creditors, unless Mr. Hanson can hold what the assignors cannot. The true inquiry then is, not what was the character of the assignment, but his character as a purchaser from the fraudulent grantee; for if the assignment is valid, then the plaintiff's judgment was no lien, and he can have no right. We must, therefore, see whether Mr. Hanson fills the character of a purchaser under the sixth section of the 13th Eliz., assuming the assignment to be fraudulent for the purpose of this inquiry, and this only.

"The first question is, what he is bound to prove; the general answer is at hand, that claiming under an exception to the law, he must bring himself within it, or he comes under the enacting clause; and he must prove it by other evidence than what is repudiated in the law by clear, comprehensive words, as not sufficient to take a conveyance out of it; they are 'any pretence, colour, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.'

"No words can better or more clearly apply to the consideration, or uses expressed in a conveyance, or other recital, averments, or declarations, which are set forth as the reasons of making it; hence it is incumbent on the party to do more than to produce the deed

containing them; for if the mere statement of the parties imposes on a creditor the necessity of proving their falsity, he might not be enabled to do it, as the matters so recited are not within his knowledge. But if they exist, they must be known to the parties to the deed, and can be easily proved; if the law was otherwise, it would be easy; as the Supreme Court of the United States say, 4 Wheat. 507, for the grantor to make out such a case by his own recital, that 'there would no longer exist any difficulty in evading, the rights of creditors.' The Supreme Court of this state have also established it as a rule, that whoever sets up a plea of purchase for valuable consideration, must support it by other evidence than the conveyance, or the receipt at the foot of it, which is only the acknowledgment of the grantor. We cannot better state the law on this subject, than in the words of that court, in Rogers v. Hall, 4 Watts, 362. 'Though in the absence of proof to the contrary, the presumption is in favour of the fairness of a transaction, yet flight and an absolute general assignment are in themselves circumstances demonstrative of fraud; and though not conclusive, they undoubtedly impose on the assignee the necessity of elucidation. He is the most cognisant of the transaction, and best able to explain it; and why should the business of explanation be laid on the creditors placed by him in the dark, though entitled to light? The question is on the existence of a valuable consideration; and it would be against a fundamental rule of evidence to burden them with the necessity of producing negative proof. The policy of handling these transactions with little attention to tenderness, is obvious and uncompromising. They are ulcers of frequent occurrence in practice, which require to be thoroughly probed, and, if necessary, laid open to the bone, and on him be the consequences who withholds the means of doing so.

"'But the defendant claims to hold discharged of the fraud, if such there were, by having, as he alleges, purchased without notice of it. A decision of the question of notice is uncalled for by the circumstances, and we give none. There was neither proof of valuable consideration, nor the semblance of it; and nothing is clearer than that a plea of purchase for value must be sustained by other evidence than the conveyance. Even the receipt of the debtor is not proof against his creditor claiming paramount to the debtor's grantee, inasmuch as his fraudulent conveyance is no conveyance at all against the interest intended to be defrauded. His receipt or other acknowledgment of payment, therefore, is the act of a grantor, done subse-

quently to a title derived from him, which, consequently, may not be prejudiced by it. Now, the defendant produced nothing but the conveyance, with whatever collateral evidences of payment may have been imbodied in it, or appended to it; and they fell far short of proof of actual payment; for, giving a security for the purchase-money, which in practice is often the consideration for a receipt at the foot of the conveyance, is not enough to entitle him to the character of a purchaser for valuable consideration, and the court properly rejected the prayer for protection on that ground.' 4 Watts, 362.

" A deed is evidence of a conveyance in fact, and when the payment of the consideration is proved, it is *prima facie* evidence of a purchase presumed to be fair till the contrary appears, unless there is something on the face of it to excite suspicion.

" This rule is founded on the same sound reasons as the rule that an asserted purchaser must prove the payment of the consideration recited; for a party who alleges fraud, ought to be prepared to prove it, and it is as difficult for a party claiming under a deed, to prove affirmatively his *bona fides*, or want of notice, as for a party claiming against it, to prove the non-payment of the money. Hence the law has been long and well settled, that on the production of a deed of conveyance, it shall be presumed to be as to fraud, &c., what it purports on its face to be, until some evidence is brought forward to impeach it in some particular which the law makes a requisite to its validity. How far the evidence goes to prove the fact, which will invalidate the deed, is for a jury to decide, if the court shall be of opinion that it conduces to prove it. Whatever would satisfy a jury that the fact existed, if the law would authorize them to presume it from the evidence, or if the court on a demurrer to the evidence would render judgment for the party offering it, then the burden of proof is shifted on to the party offering the deed, and he must bring himself within the exception or proviso of the statute, in order to make out a case under it. The creditor need not offer evidence to disprove every requisite to make out a valid purchase; it suffices to throw the proof of every requisite on the alleged purchaser, if the creditor can satisfactorily establish the want of one; in such case the general principle applies, that a party who claims under a proviso or exception to a law, must make out a case which brings himself within it, or he comes within the enacting clause, standing in no better position than the fraudulent grantor against the rights of the creditors attempted to be defrauded. In cases of this description an important

inquiry is—had the purchaser such notice as affects his purchase unfavourably? Purchasing under the assignment, the law presumes he had notice of it—its contents, whatever it referred to, and 'of such other facts as those already known necessarily put him on inquiry for, and as such inquiry, pursued with ordinary diligence and prudence, would bring to his knowledge. But of other facts, extrinsic of the title, and collateral to it, no constructive notice will be presumed, but it must be proved.' 2 Mason, 536. Besides, if there is any thing on the face of the deed of assignment, to which the law imputes fraud, or from which a jury can infer it, the purchaser has, by legal intendment, constructive notice of it, so as to impair his purchase; so as to any matter in the deed from assignees to him, the same consequences follow.

"If a purchaser has notice of a fact, he is presumed to have notice of the consequences. 1 Gall. 42. It is in full proof that the following notice was publicly read from the rostrum, at the sale by the assignees on the 30th of April, when Mr. Hanson became the purchaser, by a note in writing signed at the time.

"'Bidders will take notice, that the property on the north side of Chestnut street, 42 feet west of Schuylkill Seventh street, being 66 feet front by 158 feet deep, and also that on the west side of Delaware Sixth street, between Market and Chestnut streets, formerly known as Rubicam Hotel, have been levied upon as the property of the late firm of R. and I. Phillips, and are actually advertised for sale by the sheriff, and that the right of the assignees of R. and I. Phillips to convey any title to either of said properties, is disputed and denied.

April 29, 1839. Christopher Fallon.

"The Chestnut street lot was advertised and sold as 'clear of all encumbrance,' 'title indisputable'—the house and lot on Sixth street as 'clear of all encumbrance;' yet, if you believe the witnesses, here was actual notice that the title of the assignees was disputed—that there was an order for the sale of the property under a levy, and that it was then advertised for sale by the sheriff. It was, therefore, notice of an encumbrance by some act of record which would authorize the sale—it referred to the advertisement which pointed to the nature of the encumbrance, and was in law sufficient to put Mr. Hanson on inquiry at least. And if he had pursued it with due diligence and prudence, he must have found the judgment and other proceedings of record as they appear on the transcript read, which, connected with the notice, would show an adverse claim, and by a creditor of the assignors prosecuted with great diligence by the plain-

tiffs, contested by the assignors and assignees, and then approaching a consummation by effective process.

"It is said, that this notice was not such as the law requires, to taint Mr. Hanson's purchase, because it did not specify the particular grounds on which the right of the assignors to convey was contested, by stating, that the assignment was void by reason of fraud; and therefore, the law holds that he is deemed to have had 'no manner of notice or knowledge of the fraud, covin, or collusion,' between the parties to the assignment, this notice not being sufficient to put him on inquiry. Yet if the law were so, it seems that this or some other notice did put him on inquiry, if he consulted counsel and purchased under their advice.

"This objection has assumed a strange aspect by the remarks of counsel, that if the written notice had contained an allegation of fraud in the parties to the assignment, a suit or prosecution for a libel would have been the consequence; while it is contended, that the want of such charge makes the notice inoperative, as if the law compelled a creditor to commit a civil injury, or a public offence, in order to put a person on inquiry about the title he was about to purchase. On the other hand, if Mr. Hanson had not examined the subject fully, and satisfied himself that there was no fraud, how did it happen that when the terms of the sale were to convey a 'title clear of all encumbrance,' on any of the property, and an 'indisputable title' to the Chestnut street lot, with actual notice of an encumbrance and dispute of the title—that he accepted of a deed with only a covenant against encumbrances by the grantors, or suffered by them, taking no security against a judgment against the assignors. If he consulted counsel on the kind of title he should take, the form of the deed, and the covenants to be inserted, and was advised to accept a deed without any covenant against the very encumbrance referred to in the notice, and to pay his money, to the amount of $36,000, on the transfer of the right of the assignees without better warranty, the client must have stated a strange case to his counsel, if he was advised that he filled the character of a *bona fide* purchaser for a 'valuable consideration, without any manner of notice or knowledge, &c.' Mr. Hanson was not bound to accept a conveyance without covenants of warranty to the extent of the terms of sale; he might repudiate the purchase on any other terms than those stated in the notice of sale by the auctioneer; and if, when he accepted such a deed as he now pro-

duces, he shall be considered by you as filling the character he assumes, we think you must presume very largely and liberally in his favour, if you think he has acted with reasonable diligence and due prudence. Under all the circumstances of the case, our view of the evidence is very different; you will, however, decide on the facts for yourselves, bearing in mind, however, that the notice was sufficient, in law, to put him on inquiry into the fraud set up, to set aside the assignment. 3 Penna. 66, 67.

"There are other circumstances in this case which may affect the nature of Mr. Hanson's purchase, and his character as a purchaser, after the acceptance of the deed of the 10th of May, which are worthy of your consideration. The sheriff sale took place on the 20th of May, at which Mr. Fallon attended on behalf of the plaintiff, and Mr. Ingraham for the assignees. Mr. Fallon states, that Mr. Ingraham gave verbal notice that the property about being sold belonged to the assignees, and had been assigned to them before the judgment. Mr. Ingraham states, that, on behalf of the assignees, he gave notice, that the property did not belong to the defendants in the judgment at the time it was rendered, and referred to the assignment; but neither state, that any notice was given, that the property selling had been conveyed by the assignees to Mr. Hanson; that he was present, or any one for him; it also appears, that the deed to him was not put on record till the 23d of May, 1839. Under such circumstances, Mr. Hanson rests his case as a purchaser on his paper title, without producing a witness to prove the payment of any money, or the delivery of the deed in fact; he does not produce any evidence that it was recorded by him, or offer any reason for the omission, but asks you to presume from his paper title, that he has made out all the requisites of a purchaser, such as is protected by the law from the effects of any fraud which may attach to the assignment. If he has paid one-third of the purchase-money, it cannot well be doubted that he can prove it affirmatively, and so of the delivery of the deed, and its being put on record by him. But he adheres to his perilous position, and asks you to presume that he has done that, of which he has offered no other proof than the acknowledgment of the assignees in the deed, and their receipt at the foot; that the grantors delivered the deed, without calling the witnesses to its execution, and that it was recorded by him as a purchaser.

"We will not say that you cannot presume these things, and over-

look those circumstances which would authorize you to make a con-
trary presumption in the three particulars; but we feel bound to say,
that in your places we would not so presume.

"Should your opinion coincide with ours on the evidence and
facts of the case, Mr. Hanson would not be considered to be the
purchaser who is protected by the law, as to any of the requisites
mentioned; but the consequences are the same, if he fails in any one.
To be so, he must be, in your opinion, not only a purchaser without
any manner of notice or knowledge of any fraud in the assignment,
such as the law requires to be given to him; he must also be a pur-
chaser for a valuable consideration, actually paid, and the property
must have been *bona fide* conveyed to him, pursuant to the purchase,
so that the purchase must be in all respects an absolute one, such as
it purports to be. If you are not satisfied that this is the character
of his purchase, and his as a purchaser, then he is in no better situa-
tion than the assignees; if you think otherwise, you may find a
verdict for the defendants; if so, we must request you to find it
subject to the opinion of the court on the point reserved, which is,
whether if he is in fact a purchaser such as the sixth section of the
law defines, he can hold the property against the plaintiff, if the
assignment is fraudulent on its face. On that subject we do not think
it proper now to express any opinion; it is a pure question of law,
which we have not had time to examine fully during the trial, and
it will better the exigency of the case to reserve it."

And thereupon the said defendants' further excepted to the fol-
lowing matters or propositions of law contained in the said charge,
to wit:

"We now come to the inquiry, whether the assignment is valid
or void.

"It is alleged to be fraudulent in fact, and in law. Fraud, in
fact, consists in the intention to prevent creditors from recovering
their just debts, by any act which withdraws the property of a debtor
from their reach; both parties must concur in the illegal intention.
1 Bald. 356, 357; S. C. 7 Peters, 398, &c. But the least degree of
concert or collusion between the parties to an illegal transaction, makes
the act of one the act of all. 4 Watts, 361. Fraud in law consists
in acts which, though not fraudulently intended, yet as their tendency
is to defraud creditors, if they vest the property of the debtor in his
grantee, they are void for legal fraud, which is deemed tantamount

to actual fraud, full evidence of fraud, and fraudulent in themselves, the policy of the law making the acts illegal. 1 Bald. 356, 553. The alleged acts of fraud are numerous, covering a large space of time, but all are offered in evidence as bearing on the assignment; they are competent evidence to impeach it, if the plaintiff has satisfied you that they tend to show the intention of the parties at the time of making it. With this object, you may take into consideration whatever preceded or followed it, if the circumstances show a connected chain of facts leading to, or following the assignment, and they can be in any way brought in to explain its nature and character. But proof of fraud in any transaction wholly unconnected with this, or not tending in any way to affect its fairness in fact or law, ought not be regarded.

"Fraud must be brought home to this transaction, but as to acts which led to it, which were preparatory, and with reference to it, as well as those which followed or grew out of it, in order to effectuate the intention of the parties, they are as proper to be considered as those which took place at the time. The character of a deed, or other act which affects creditors or purchasers, may be judged of by the subsequent conduct of the parties, which throws back light on their conduct. 5 Peters, 280, &c. You will, therefore, carry these principles into your consideration of the various acts of alleged fraud, which the plaintiff has set up to invalidate this assignment. The evidence of fraud consists, 1st, in not assigning the Walnut street house and lot, and furniture. The house and lot was conveyed to Joseph L. Moss, in 1834, for the consideration of $3000 paid, and a mortgage of $8000, which remained a lien on it; on the 20th March, 1837, he conveyed it to David Samuel, one of the assignees, for $15,000, by deed recorded on the 21st; Samuel re-conveyed to Moss on the 25th March, for the same consideration, by deed recorded on the 27th; on the 24th March, 1837, Joseph L. Moss gave a warrant of attorney to confess a judgment to John Moss for $24,600, reciting a bond for that amount which was not produced at the trial, on which judgment was entered on the 27th March. On the 27th May, 1837, Joseph L. Moss made a bill of sale of his household furniture to John Moss for $3900, in consideration of the money due on the judgment of $24,600; but no credit was given for the amount of the furniture on the execution which issued upon that judgment. Notice was given to produce the bond, and prove the consideration

for which it was given, but neither was done; Joseph L. Moss continued in possession of the house and furniture, and John Moss paid one or more of the creditors of Joseph L. Moss and Isaac Phillips, who opposed their discharge under the insolvent act, but withdrew their opposition in consequence.

" In deciding on this transaction throughout, we must be understood as not intending, in any way, to intimate any opinion as to its effects on any controversy existing, or which may arise between Mr. John Moss and the plaintiff, or on any other creditor of R. and I. Phillips, or either; we look upon it solely with a reference to withholding the house, lot, and furniture from the assignment, as a badge, evidence, or ground of inferring fraud in the assignment, in the first place. Next, to ascertain whether Joseph L. Moss has offered any evidence to rebut the proof or presumption of fraud attending the transaction; for it is one thing, whether a debt is really owing to John Moss to the amount of the judgment, and a very different thing, whether Joseph L. Moss has given such evidence as he was bound to do, in order to repel the imputation of fraud in keeping this property back.

" He sets up the encumbrance upon it as a reason for not assigning it, and if there is in the evidence any thing proving or conducing to prove fraud in so doing, any thing from which a jury may presume fraud, he must rebut it, or the imputation may be fastened upon his conduct.

" As to the furniture, there is evidence and a strong badge of fraud in retaining possession, even if the sale was made to a purchaser, and the money proved to have been actually paid; the want of possession by the purchaser must be accounted for—it is not enough to set up family considerations; they will not suffice, unless a sheriff's sale has intervened, or some other reasons given why possession did not accompany the bill of sale. This has not only not been done, but no proof has been offered that any consideration has been paid, except that the bill of sale recites the judgment as the consideration which is set up by Joseph L. Moss as evidence that he owed the amount for which it was rendered. We will not say whether, as between John Moss and other persons, this judgment is evidence of the debt or not, without other proof, but as between Joseph L. Moss, and one of his creditors, who alleges it to be fraudulent, it is only his acknowledgment that he owed the amount, which is no evidence

between him and the plaintiff under the circumstances in this case. He has been called on to prove the consideration of this judgment, which he may be presumed to have been able to do, and has not done it, but relies solely on the record of the judgment, and proceedings upon it; as between the parties to this suit, this is not sufficient to rebut the fraud of this transaction, if there was any, or if he sets up Mr. John Moss as a purchaser of the furniture in part payment of the judgment, he must show it by something more than appears.

" As to the house, there is much unaccounted for in the change of apparent ownership in so short a space of time, especially when Mr. Samuel is an actor; he is an assignee in the assignments of March and June, in 1837; fraud is imputed to him, as well as the assignors; he and Joseph L. Moss can explain these transfers, but do not do it; they too rest exclusively on the papers which are in evidence; without calling a witness to explain what you will probably agree in opinion with us requires explanation. Their deeds purport to be for the consideration of $15,000 each, with receipts at the foot for the payment in full, which must be taken as true, or false; if true, why then was this passing of property and money from one to another in five days, we are not informed; if false, the deeds are entitled to no credit till explained.

" As to the Arch street house and lots, it appears that the lots were conveyed to Mrs. Phillips in August, 1834, for the consideration of $1200, and an annual ground-rent of $693, recorded on the 23d of March, 1837, the day after the execution of the New York assignment. In September, 1834, Isaac Phillips made a contract for building a house on the Arch street lots, which was finished in the summer of 1835, at an expense exceeding $22,000, exclusive of furniture. In November, 1821, a house and lot in Locust street was conveyed to Sarah Moss, afterwards Mrs. Phillips, who with her husband conveyed the same, on the 1st October, 1834, to Peter McCall, for $10,000. In April, 1837, Isaac Phillips conveyed his life-estate in the Arch street house and lots to John Moss, for $7102 12, being the value of his life-estate therein, as estimated at the annuity office, which sum was recited and receipted for in the deed as paid. In June following, Isaac Phillips made a bill of sale of the furniture remaining in the Arch street house, in consideration of $5507 paid, and possession stated at the foot of the bill of sale to have been delivered, to which was attached a schedule of certain

articles, valued at $860. This sale was to Joseph M. Moss, one of the assignees.

" The assignment of June, 1837, did not embrace the house and lots in Arch street, the furniture, or any claim by Isaac Phillips on the property as the separate estate of his wife. or for any debt due by her on account of the money expended in building the house. Though the furniture was not assigned, it was appraised as part of the assigned effects, and entered on the inventory thereof.

" In reference to these transactions, the same remarks are applicable as to the Walnut street property; reliance is had solely on the papers produced, without any effort at explanation of what requires it; no proof is offered of the payment of any money on the bill of sale of the furniture, or of any delivery of possession to the purchaser, other than the statement at the foot. Nor is this any evidence that any money was paid on the sale of the life-estate of Isaac Phillips in the house and lots, except his own acknowledgment in the deed; or any proof of what money was paid on the sale of the Locust street lot, other than the recital and receipts of Phillips and wife; and there was no attempt to show the application of any part of it, to building, or in furnishing the house.

" These circumstances, and the withholding from record the deeds to Mrs. Phillips till after the declared insolvency of the firm, and their assignment of the New York effects, leave the expenditure of so large a sum on the house, open to much ground for your consideration. It has been contended by defendants' counsel, that though these transactions may be open to suspicion, yet that they can effect only the property in question, and that the assignment is valid notwithstanding. This argument is good, so far as it respects the non-delivery of possession of the furniture; that may be considered as rather evidence or a badge of legal, than of actual fraud, not affecting the validity of the assignment, as a substantive cause for holding it void. But if you are of opinion that these transactions indicate an intention in the parties, assignors and assignees, to make such a disposition of the property of the assignors, as to place it beyond the reach of creditors, by any other means than fair and *bona fide* sales, transfers, and dispositions of it, or by encumbrances for debts justly due, and you can trace such intention in the conduct of the parties from March till June, and that the last assignment was the carrying such intention into effect, then it is void throughout. We do not

say that keeping back property from an assignment is alone evidence of fraud—our opinion is founded on all the circumstances of the cas which are in evidence, of which one of great weight in our minds is the entire want of any attempt at explanation of matters which throw the burden of proof on the defendants. It is a bold requisition on a jury to make presumptions of facts merely from papers which contain only the declarations and recitals of the party who makes them, where direct proofs of the facts can be made if the parties desired to make it. The law makes no such presumptions in favour of the party who produces deeds, or papers, if it does not appear that he offers the best evidence of the facts which it is in his power to produce; especially if he keep back better evidence which is presumed or appears to be at his command; and a jury ought to be very cautious in making such presumptions, which may tend more to encourage than check the suppression of truth.

" The plaintiff has referred to the records of the Court of Common Pleas and the discharge of the assignees under the insolvent act, as evidence of fraud, which is reflected back on the assignment; you will judge how far it is proved by extraneous evidence, taking what appears on the record and papers attached to it as fully proved and operating according to its legal effect. But whatever may be your opinion of the matters so proved, or apparent on the record, you will refer them to the assignment; and though you may think there was fraud in the insolvent proceedings, you will not attach it to the assignment, unless you have reason to believe that it shows a fraudulent intention in some way connected with it, growing out of it, or tending to effectuate its object more completely.

" The composition with the opposing creditors was an improper act, and taints the conduct of the parties who made it with suspicion, which may be thrown back on the assignment, if you think it was connected with, or formed a part of the original design.

" Much has been said about the proceedings in the Orphans' Court, and were it necessary for the purposes of this case to decide all the questions which have been raised in relation to them, we should have much difficulty in doing it; for there are terms and provisions introduced into the act of 1832, under which these proceedings were conducted, that are not to be found in preceding laws, and are of rather an unusual character as respects the jurisdiction of that court, being similar to the provisions in the insolvent law of

1826, which we have before noticed. If it was an act of Congress we should have less difficulty, but being a law of a state, affecting many titles, we would give an opinion on its construction, only in case of its being necessary to decide the merits of this case, which we think it is not, as in our opinion it cannot avail the defendants in this case, admitting the power of the court to be undoubted, to do what it has done in relation to the Sixth street property.

" On inspecting the record of the Orphans' Court proceedings, it appears there, that in November, 1837, about a month after the discharge of Joseph L. Moss and Isaac Phillips, under the insolvent act, Isaac Phillips, as administrator of the estate of Robert Phillips, applied to the Orphans' Court for authority to sell the Sixth street lot and house, for the purpose of paying a debt due to himself, amounting to more than $35,000, which he stated in his petition, was the only debt due by Robert Phillips at his death. A sale was made in December, 1837, by the administrator, reported to and confirmed by the court; whereupon a deed was executed to Joseph M. Moss and David Samuel, the purchasers, for the consideration therein expressed and receipted for as paid, of $22,500, dated 30th January, 1838; on the back of which was a conveyance by them to Mr. Hanson, dated 10th May, 1839, for $20,300, for which a receipt was given at the foot.

" The record contains no evidence of the debt due by Robert to Isaac Phillips, except the statement of the latter in his petition, verified by his own affidavit thereto annexed; yet Mr. Bridges and Mr. Welch, two of the clerks of the firm of R. and I. Phillips, state, that in the books of the firm there was an account open with each partner. The petition states the exact sum due on its date to be $35,000. A schedule attached to the insolvent petition of Isaac Phillips, states in detail the personal expenses of the members of the firm for nineteen years, in exact sums, which could not well be done without a reference to books or accounts; yet they are all suppressed, and the whole proceedings of the Orphans' Court are based on the mere statement and affidavit of Isaac Phillips, of the existence of so large a debt, when there can be little, if any doubt, that if such a debt was due, there was better evidence in the party's power.

" In looking at the deed, we find it to express the payment of $22,500 to I. Phillips, as the purchase-money; yet there is nowhere found any assignment of this alleged debt by Isaac Phillips, nor any

notice of it in his schedule in the insolvent proceedings; it must be observed, too, that Robert Phillips left three surviving brothers, so that Isaac Phillips was entitled only to one-third the purchase-money beyond the debt justly due to himself. It appears, too, that J  h M. Moss, one of the assignees, and Joseph L. Moss, were securi ies in the administration bond, and John Moss and E. L. Moss w re securities approved by the court, for the appropriation of the proceeds of the sale according to law. It also appears, that, though Robert Phillips died in December, 1833, no administration was taken out on his estate till, in January, 1837, after a citation from the register's office, in conformity with the law respecting collateral inheritances. Now, if we take this transaction as it purports to be on the face of the Orphans' Court proceedings, it is this, and nothing else.

"In June, 1837, Isaac Phillips and Joseph L. Moss assign to J. M. Moss and David Samuel the Sixth street house and lot, on certain trusts as their estate, owned by them and the firm of R. and I. Phillips; in December, 1837, the assignees purchase this property from Isaac Phillips, as the estate of Robert Phillips, for $22,500, take this amount from the residue of the assigned fund, pay it to Isaac Phillips in January, 1838, and in May, 1839, convey it to Mr. Hanson for $20,300, making a dead loss to the fund assigned $2,200, besides interest.

"This is the transaction as it appears on the record and deeds; if it was so in fact, how would it look when it appeared in the accounts of the assignees as trustees, whe t they were called on for a settlement? Would auditors, or the court, approve of such conduct?

"In our opinion, a grosser fraud could not well be imagined, and in order to avoid its imputation, the parties who set up the Orphans' Court proceedings, as giving a title to the assignees by the deed of Isaac Phillips, most distinctly admit its falsity, that no money was paid, and that the whole proceeding was got up for the purpose of extinguishing the mere legal right, which was supposed to be in Robert Phillips, and not to affect any rights against the assignment.

"This saves us the necessity of further inquiry, whether these proceedings are available to the defendants as a title distinct from, and adverse to that of the firm of R. and I. Phillips; but these proceedings furnish a salutary lesson to courts and juries, not to give much credence to deeds and papers, when the parties to them keep back evidence of their true character, whereby light is excluded which would otherwise explain their nature and object.

"If these proceedings were concocted by Isaac Phillips and the assignees, for the purpose of injuriously affecting the creditors of R. and I. Phillips, who did not assent to the assignment, they are so far void as the evidence of participation in the fraud by the assignees is sufficient on the authority of the Supreme Court of this state, in 4 Watts, 361, to make the act of one the act of all. On their own admission, it was not a real sale and purchase—no consideration was paid or stipulated to be paid; it was not intended to pass any title adverse to that of R. and I. Phillips, but merely to unite what was supposed to be an outstanding legal title, to the equitable right existing in the members of the firm. That such was the object, and no other, appears not only by the admission of all the parties now, but is manifest from the conduct of the assignees, in conveying to Mr. Hanson; for they neither recited any title derived under the Orphans' Court sale, nor professed to convey any; as between the parties, therefore, it was not a binding sale, and if the object was merely what has been declared, it must operate according to the intention with which it was made, and the legal effect of what was done. Of consequence, it cannot impair the right of the members of the firm; if the assignment is valid, the sale inures to the use of the assignees, as an extinction of any right in Robert Phillips, unless his heirs contest it; and if the assignment is void as to the plaintiff, the Orphans' Court sale does not affect his right, but inures to his use, as standing in the place of the defendants in the judgment under which he purchased.

"Having thus disposed of the matters set up by the plaintiff, in support of the allegation of actual fraud in the assignment, which is exclusively a question for your consideration, we proceed to notice the objections to its validity on the ground of legal fraud, which presents questions of law for the decision of the court.

"Of these objections, a very prominent one is, that the requiring a release from the creditors of the firm, as a condition precedent to their coming in for any portion of the property assigned, is illegal, and invalidates the assignment. If this were a new question, or was now open to examination in this court, we should be strongly inclined to hold the assignment void, as contrary to the policy of the law; but the Supreme Court of the United States have decided otherwise. In Brashear *v.* West, they hold, that when a debtor assigned all his property for the benefit of his creditors, a stipulation for a release had been settled by the courts of this state to be valid, and that this set-

Hanson et al. *v.* Eustace's Lessee.

tled construction of the law must be followed in the courts of the United States. 7 Peters, 615, 616. This decision is binding on you and us, as the established law of the case; you will consequently disregard any opinion of ours to the contrary, and consider the law to be settled in favour of the assignment on this point. Had the case in the Supreme Court of this state, in which the question was supposed to have been decided, been as closely examined, and that cause been argued as this has been, the result might have been different; it is, however, now too late to re-examine the question here; elsewhere I may feel at liberty to think otherwise; yet it may tend to shake too many titles held under such assignments, to interfere with them in any other way than by prospective legislation.

"But though you will take the law to be thus settled, when the assignment is of the whole of the debtor's property and effects, it is otherwise if any portion is fraudulently kept back from the assignment; should such be your opinion in this case, then the assignment would be void by the exaction of a release from the creditors, according to the opinion of the Supreme Court of this state, in 5 Rawle, 221, as well as the soundest principles of law. We, however, are not desirous of giving you any imperative instructions on any of the grounds of legal fraud on which this assignment is assailed, nor do we think it necessary to state them in detail; they arise on the face of the assignment,—they form a part of the plaintiff's case, which cannot be excluded from it, and must be decided by the court as questions of law, should your verdict on the evidence make it necessary.

"This case is an interesting and important one, not only to the parties concerned, as to the value of the property in dispute and what may be consequently involved, but, on public considerations, arising from the nature of the transactions in evidence, their character and tendency. We think it better that the case should be decided on the questions of fact involved, reserving for future consideration any matters of law not yet stated to you, which your verdict may leave for our decision, should it be for the defendants. But though every question of fact is for your consideration solely, we are not desirous of throwing on you the whole responsibility, without expressing our opinion on the result of the evidence, not as a direction to bind, but as opinion merely, which will have such weight, and such only, as you may think proper to give it  It is a painful

task to view the transactions which are in evidence, in order to ascertain whether they are fraudulent; but it is a duty not to falter, and it will have a better effect, if there is a concurrence of opinion between the jury and the court on that question, than to have it in doubt as to either. A careful consideration of all the testimony in the case has led our minds to the conclusion, that there are such circumstances as wi'l' fully justify your finding the assignment to be invalid on the ground of its being fraudulent as to creditors in point of fact."

And inasmuch as said charges and instructions, so excepted to, do not appear upon the record, the counsel for the defendants did then and there tender this bill of exceptions to the opinion of the said court, and requested the seals of the judges to be put to the same, according to the form of the statute in such case made and provided; and thereupon the aforesaid judges, at the request of the counsel for the defendants, did put their seals to this bill of exceptions, pursuant to the aforesaid statute in such case made and provided.                HENRY BALDWIN, [L. s.]

Jos. HOPKINSON,   [L. s.].

*Hubbell* and *Sergeant*, for the plaintiffs in error.
*Guillou* and *Fallon*, for the defendant in error.

Thirty-seven points were stated by the counsel for the plaintiffs in error, in which, it was alleged, the court below erred. The argument upon both sides branched out into numerous points of law which the record suggested. The reporter would take pleasure in stating all these arguments, but for the excessive length of the bills of exception and the circumstance that the decision of the court rests upon a single point in the charge of the court below, viz., the effect of the refusal to furnish books and papers, in conformity with a notice. He only mentions, therefore, such portions of the argument as bear upon that part of the charge.

Four of the points of the plaintiff in error were thus stated by his counsel.

11th. The court below erred in charging the jury that they might presume, that Robert Phillips, or his heirs, had made a conveyance, vesting the legal title in the firm of R. and I. Phillips, and that it so remained at the time of the assignment, and that it was by such a conveyance as would enable them to enjoy the property against Robert Phillips and his heirs.

12th. The court below erred in charging the jury that this presumption is not founded on the belief alone that the fact existed, but much more on those principles which enforce justice and honesty between man and man, and tend to the security of possessions.

13th. The court below erred in charging the jury that the defendant below, Hanson, was under any obligation to produce the books of Joseph L. Moss and Isaac Phillips, or of the firm of R. and I. Phillips, and that any presumption whatever could be made to his disadvantage by the non-production of them. And also, as against the defendant below, Hanson, in admitting evidence of their contents.

14th. The court below erred in charging the jury that they had the right to presume that the production of the books would have been favourable to the plaintiff below, and unfavourable to the defendants below, in every respect, as bearing upon the ownership of the property.

*Hubbell*, said:

Another defence set up by the defendants below is, that the legal title of part of the subject of this ejectment, viz., the Sixth street house, was never vested in the assignors, R. and I. Phillips, and that therefore the plaintiff below, claiming under them, cannot sustain an action of ejectment for that property.

His honour, the judge, charged the jury, that a conveyance or the outstanding legal title to the assignors may be presumed by the jury.

There is no warrant in law for the jury to presume a conveyance of the legal title.

There are three ingredients commonly concurring with such presumption.

1. Time.

2. Duty.

3. Acts inconsistent with the outstanding of the legal title.

There are four classes of cases in which such presumption has been made.

1. Where, in the deduction of title, the deeds before and after the step sought to be presumed are produced, and possession has gone according to the limitations in the latter. After thirty or forty years, the chasm will be filled up by presumption.

2. Deeds proper to have effected a change or alteration in a family estate, when the family have treated it as so altered, will be presumed after the lapse of many years. Matthews on Presumptive Evidence, 219.

3. Where the legal title is vested in trustees for a specific purpose and to convey at a specified time, and the property is delivered into the hands of the *cestui que trust* at the specified time, a conveyance will be presumed after the lapse of many years. Matthews, 220.

4. Even where there is no express trust to convey, a conveyance has been presumed in two cases where the purpose of vesting the title in the trustees was temporary; the presumption was made in one case after a hundred years, and in the other after the lapse of seventy years. But these cases are considered of questionable authority. Matthews, 225.

Where lands are conveyed to trustees without any expressed or manifest object, requiring the separation of the legal and equitable estates and the beneficial enjoyment continues from the first in the same persons or their privies, and there is nothing in this enjoyment inconsistent with the outstanding of the legal estate, no lapse of time will establish the presumption of a conveyance by the trustee of the legal estate to the *cestui que trust.* Matthews, 228.

If there had been, in the present case, a duty to convey, of which there was no evidence, still the ingredient of time was wholly wanting. The conveyance to Robert Phillips was in 1832, and the sale under the judgment in 1839—an interval of but seven years : a period far short of the statute of limitations, which seems to furnish, except under extraordinary circumstances, the minimum of time necessary to such presumption. 13 Johns. 513; 7 Wheat. 59, 108; 6 Wheat. 581; 2 Wend. 1; 5 Taunt. 170.

The court further charged the jury, that the admission of secondary evidence to prove the contents of the books was not the only effect of their suppression, but that they ought to presume that the production of the books would have been favourable to the plaintiffs and unfavourable to the defendants in any other aspect as bearing on the ownership of the property; that the court would, as a court of equity, hold on such evidence that there was such a clear equitable title in the firm, that Robert Phillips or his heirs were bound, on every principle of justice, conscience, and equity, to make a conveyance so as to make that title a legal one; and that the jury might presume as largely as a chancellor might do.

Our objections to this charge may be subdivided into

1st. The error in charging that the plaintiff below had any right to call for the production of these books, or that the effect of the notice

and non-compliance with it, was any thing more than to admit him to produce secondary evidence of their contents.

2d. The error in charging the jury that Hanson was in anywise to be affected by the non-production, or that he was under any obligation to resort to the act of Congress to compel their production, or that he or the plaintiff below could compel their production under the act of Congress.

The act of Congress only compels a party to produce books or papers which contain evidence pertinent to the issue, in cases and under circumstances where he might be compelled to produce the same by the ordinary rules of proceedings in chancery.

To the rules of chancery we must resort to know under what circumstances chancery compels the production of books and papers. Sergeant's Constitutional Law, 158, 159.

The party requiring the production of books and papers must show right, property, or interest in them. 2 Coxe's Chancery Cases, 242; 1 Coxe's Chancery Cases, 277, 365; 4 Johns. Chan. Ca. 382.

The party requiring the production of books and papers must obtain a rule on the opposite party to produce them, which must be supported by affidavit, showing that they are in the possession of the party required to produce them; that they contain evidence pertinent to the issue, and that all the circumstances exist which would induce a Court of Chancery to direct their production. And the party required to produce them may deny all this by counter-evidence on the trial. 4 Wash. C. C. Rep. 126; 3 Wash. C. C. Rep. 582; United States *v.* Twenty packages of goods, 1 Gilpin, 306.

The party required to produce, is, upon every principle of chancery practice, entitled to deny upon his own oath, the whole of the allegations upon which their production is sought, to explain any entries found in the books, &c. 2 Penn. Rep. 139; Hare on Discovery, ch. 2, sect. 6, pp. 228, 238; 2 Chitty's Equity Digest, 1129, where the whole is reviewed.

The court must rely on the oath of the party required to produce, as to the relevancy of the books; also, as to what parts are material. Hare on Discovery, 230. He may seal up such parts as he declares to be immaterial. Hare on Discovery, 230; 1 Swanson, 539

But we particularly complain of this error as affecting Mr. Hanson, who had not the custody of the books, against whom they would not have been evidence if produced. He could not have made the affidavit required to enforce their production, and he could not have

enforced the penalty given by the act of Congress for their non-production, viz. judgment against the recusant party.

*Guillou*, for the defendant in error.

In vindication of the charge of the court, that the jury might presume a deed from R. Phillips to R. and I. Phillips, cited 11 East, 56; 4 Durn. and East, 682; 1 Caines, 457; 3 Watts, 167; 10 Serg. & Rawle, 389, 391; 7 Wheat. 110; 2 Wendell, 13, 15; 12 Ves. 24, 251, note; 6 Bingh. 180; 5 Barn. & Ald. 233; 19 Johns. 345; 8 East, 263. And further to sustain the court in leaving it optional with the jury, 9 Wheat. 486; 4 Dallas, 132; 1 Yeates, 32.

*Fallon*, on the same side, after directing his attention to other points of the case, said;

We wanted the books to show, amongst other things, that the Sixth street house was purchased with the partnership funds, in which case it became partnership property. 1 Sumner, 182; 2 Wash. C. C. R. 441; 7 Serg. and Rawle, 438.

*Sergeant*, in reply and conclusion.

Hanson never had the books, and yet is made reponsible for their not being produced. The notice was to produce the books of a firm, carrying on a very extensive business, running through six years, and tax receipts for eight years. In the courts of the United States a party can choose one of three modes.

1. A common law notice.

2. A proceeding in equity for papers.

3. An affidavit and rule under the Judiciary act.

This was a common law notice exclusively. As such, it only gave the party a right to use secondary evidence by proving the contents of papers. The law presumes that a party knows what he wants, and allows him to call for it, but does not give him the power, under a drag net notice like this, to bring up the books and papers of six years accumulation. Can it be, that a party, without affidavit, without an order of court, without specification, shall be entitled to have a cart load of papers brought into court, many of them of a private character, and open to the inspection of everybody? If this was the rule, the act of Congress must have been passed to restrain it; otherwise it would both be insufficient and intolerable.

The charge says, where papers are suppressed by a party, it is a ground of suspicion. This is true in a chancery proceeding. But

there is no spoliation of papers in this case, nor is the notice to be brought under the chancery head; neither is it under the act of Congress. There is no affidavit, no order of court, no hearing of the party.

It has been already argued, that before a presumption can be raised, circumstances and time must justify it. It is in favour of possession and time. Supposing, here, that Robert Phillips bought the property with the partnership funds, and thereby became a trustee for the firm, where is there any ground to presume an end of the trust? The presumption would be to the contrary, that he was to hold it as long as both parties agreed.

Mr. Justice WAYNE delivered the opinion of the court.

The defendants in this case having failed to produce on the trial of it certain books of original entry, day books, &c., of the late firm of R. and I. Phillips, which had been called for by a regular notice, the court permitted the plaintiff to give secondary evidence of their contents. The object of the plaintiff in introducing the secondary evidence was to prove that the legal title to the Sixth street property was in R. and I. Phillips, the defendants having previously introduced a deed to that property from R. J. Herring and wife, dated the 9th June, 1832, to Robert Phillips.

The partners of the firm of R. and I. Phillips were Robert Phillips and Isaac Phillips. That firm, however, was dissolved by the death of Robert Phillips in 1833. The survivor then took into partnership Joseph L. Moss, and the new firm traded under the style of the original firm of R. and I. Phillips.

The court, in reference to the refusal of the defendants to produce the books, and to the secondary evidence which had been given of their contents in respect to the Sixth street property, charged the jury, that, "In an ordinary case, the jury must decide, from the evidence before them, what facts have been proved; but in this case there is one feature which is rather unusual, and to which it is necessary to call your special attention, as a matter which has an important bearing on some of its prominent points. Timely notice was given by the plaintiff's counsel to the counsel of the assignors and assignees, to produce at the trial the books of R. and I. Phillips; no objection was made to the competency of the notice; they were called for, but were not produced till the day after the evidence was closed, and at the moment when the court had called on the plaintiff's counsel to address the jury. No reason was assigned for their non-production,

save the reference to the illness of Mr. Moss; but Mr. Phillips was in court; notice was given to Mr. Hanson, though none was necessary, as the books could not be presumed to be in his possession. That they could have been produced before the evidence on both sides was closed, can scarcely be doubted, when so many were produced afterwards. Their production, then, was no compliance with the notice; the plaintiff could not, without leave of the court, have referred to them; he was not bound to ask it, and had a right to proceed, as if they had not been produced.

"Mr. Hanson had a right to call for the books; claiming by an adverse title, he might have moved the court for an order to produce them, but he made no effort to procure them; we say so, because there was no evidence that he did in any way endeavour to have them produced, although the court, in their opinion on the motion for a nonsuit, plainly intimated the effect of their non-production.

"There has, therefore, been no satisfactory or reasonable ground assigned for their having been kept back, and the plaintiff has a fair case for calling on you to presume whatever the law will authorize you to presume as to the contents of the books. On this subject the fifteenth section of the Judiciary act has made this provision: 'That all the said courts of the United States shall have power, in the trial of actions at law, and on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases, and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery; and if a plaintiff shall fail to comply with such order to produce books or writings, it shall be lawful for the courts, respectively, on motion, to give the like judgment for the defendant, as in cases of nonsuit; and if a defendant shall fail to comply with such order to produce books or writings, it shall be lawful for the courts, respectively, on motion as aforesaid, to give judgment against him or her by default.' This enables courts of law to apply the same rules and principles, where papers or books are withheld, as have been adopted by courts of equity, which are these, in our opinion, as long since expressed in Askew v. Odenheimer, 1 Baldwin Rep. 388, 389."

"It must not, then, be supposed that the only effect of the suppression or keeping back books and papers is to admit secondary evidence of their contents, or that the jury are confined, in presuming their contents, to what is proved to have been contained in them; a

jury may presume as largely as a chancellor may do, when he acts on his conscience, as a jury does, and ought to do, and on the same principles.

" Mr. Bridges states that he believes there is an entry on the books, of the transfer from Herring to Robert and Isaac Phillips, but don't know how the transfer was made. It is in proof, by the clerks of Robert and Isaac Phillips, that an account was open on their books with the Sixth street lot; that the money of the firm was applied to the payment of the consideration money to Herring; one of the persons who erected the new building says he was paid by the notes and checks of the firm ; a tenant proves that Joseph L. Moss rented it in the name of the firm, who furnished it to the amount of $1000, and the tax-collectors prove the payment of taxes by the firm. In opposition to this evidence, the defendants offer nothing; the books of the firm are suppressed, when they could and ought to have been produced; and the sole reliance in support of the title of Robert Phillips is the deed from Herring. If you believe the witnesses, Robert Phillips never was the sole and real owner of this property on the first purchase; and if you think the facts stated are true, you may and ought to presume, that if the books had been produced, they would have shown that the payment of the whole purchase-money, and the whole expense of the improvements made on the lot, were paid by the firm ; that it formed an item of their joint estate, and was so considered by the partners. You may, also, and ought to presume, that the production of the books would have been favourable to the plaintiffs, and unfavourable to the defendants, in any other aspect as bearing on the ownership of this property. On such evidence we would, as a court of equity, hold that there was such a clear equitable title in the firm, that Robert Phillips, or his heirs, were bound, on every principle of justice, conscience, and equity, to make a conveyance so as to make that title a legal one. And when it appears that the members of the new firm had conveyed it in trust for creditors, as their joint property, that the grantees had accepted the conveyance, and sold the property under the assignment; that the purchaser from them had accepted a deed reciting theirs, and no other title—we cannot hesitate, as judges in a court of law, in instructing you that you may presume that such a conveyance from Robert Phillips, or his heirs, has been made, as they were bound in equity and good conscience to make.

" Legal presumptions do not depend on any defined state of things ;

Vol. II.—89

time is always an important, and sometimes a necessary ingredient in the chain of circumstances on which the presumption of a conveyance is made ; it is more or less important, according to the weight of the other circumstances in evidence in the case. Taking, then, all in connection, and in the total absence of all proof of any adverse claim by Robert Phillips, or his heirs, from 1832, every circumstance is in favour of the presumption of a conveyance ; and we can perceive little, if any weight in the only circumstance set up to rebut it, which is the proceedings in the Orphans' Court. You will give them what consequence you may think they may deserve, when you look to the time and the circumstances under which they were commenced, carried on, and completed by a sale for $22,500, which counsel admit. was not paid, and also admit that the sole object was to extinguish the mere spark of legal right remaining in Robert Phillips or his heirs, and not because he or they had any beneficial interest in the property. If there was lawful ground for presuming the existence of a conveyance from him, or them, before November, 1837, we should think that any thing accruing afterwards was entitled to no weight in rebutting such presumption : and were we in the jury box, we would think it operated the other way. It was for the interest of the assignees and assenting creditors to consider the conveyance as not made ; for if it had been made previously, a non-assenting creditor to the assignment might take it under a judgment, as was done by the plaintiff, and thereby hold it; if the assignment did not pass the title ; whereas, by taking the deed as not made, the Orphans' Court sale would vest the title in the assignors, and leave no legal right on which a judgment against Joseph L. Moss and Isaac Phillips could attach. As, however, this is a matter entirely for your consideration, we leave it to your decision, with this principle of law for your guide : that on a question whether a conveyance shall be presumed or not, the jury are to look less to the direct evidence of the fact, than to the reasons and policy of the law, in authorizing them to infer that it was made, if the party who was in possession of the legal title was bound in equity to convey to the real, true, equitable owner. This legal presumption is not founded on the belief alone that the fact existed, but much more on those principles which enforce justice and honesty between man and man, and tend to the security of possessions which have remained uninterested and undisturbed. Should your opinion be in conformity with ours on this point, you will presume that there was a deed from Robert Phillips

or his heirs, competent to vest the title to the Sixth street lot in the firm of Robert and Isaac Phillips; that it so remained at the time of the assignment, and that it was by such conveyance as would enable them to enjoy the property against Robert Phillips and his heirs."

It appears, then, that the court made the refusal of the defendants to produce the books, the secondary evidence of their contents, and other evidence in the cause, the basis upon which it gave the foregoing instructions to the jury. The defendants excepted to them.

The inquiries therefore arising, are—had a case been made, which authorized the court, as a matter of law, to give an opinion to the jury, that the facts proved would justify the presumption of a deed; and, if not, were the instructions given in terms which left the jury to make the inference from the evidence alone, unaffected by considerations which it is not the province of a jury to indulge, that the legal title to the Sixth street property was in the late firm of R. and I. Phillips?

This property may be the partnership-estate of the original firm of R. and I. Phillips, without the legal title being in the copartnership or in either of the partners. A deed was in evidence, that the legal title had been made to Robert Phillips. The plaintiff wished to show, that Robert Phillips had conveyed it, before he died, to the firm, or that there were circumstances in the case which raised the presumption that he had done so. No evidence was given to show that Robert Phillips had made such a conveyance. On the contrary, as the case stood, the proof was, that R. J. Herring and wife had conveyed the Sixth street property to Robert Phillips, by deed dated the 9th June, 1832. The deed was in evidence. The plaintiff then proceeded to give secondary evidence of the contents of the books, which the defendants had refused to produce. That secondary evidence, as it is stated in the instruction, is, that "Mr. Bridges states that he believes there is an entry on the books of the transfer from Herring to Robert and Isaac Phillips, but don't know how that transfer was made. It is in proof, by the clerks of Robert and Isaac Phillips, that an account was open on their books with the Sixth street lot; that the money of the firm was applied to the payment of the consideration-money to Herring. One of the persons who erected the new building says he was paid by the notes and checks of the firm; a tenant proves that Joseph L. Moss rented it in the name of the firm, who furnished it to the amount of $1000; and the tax-collectors prove the payment of the taxes by the firm." Such is the proof, and

the only proof in the cause to show that the legal title to the Sixth street property was in the late firm of R. and I. Phillips. It may justify the inferences in the court's instructions, that Robert Phillips never was the sole and real owner of this property on the first purchase; that, if the books had been produced, it would have been shown that the consideration money for the lot was paid by the firm; that all the improvements were paid for by the money of the firm; that it formed a part of their joint estate; that they so considered it, and that Robert Phillips was bound in equity and good conscience to make a title to the firm; but the evidence is certainly deficient in those particulars which, according to the established law, will permit the presumption of a deed by a jury, as a matter of direction from the court. Before a court can instruct a jury to presume a grant or deed for land, time or length of possession must be shown, which, of itself, in certain cases, and in other cases, in connection with circumstances, will induce the presumption of a grant as a matter of law, or as a legal effect from evidence, which the jury is instructed to make, if in its consideration of the evidence the jury believe it to be true. Or when the presumption in fact as to a legal title is founded upon the principle of *omnia rite esse acta*. Supposing, then, that the court did not intend to instruct the jury, that the legal effect of the evidence was to raise the presumption of a deed—we will now inquire, what effect the refusal to produce books and papers under a notice has upon the point which a party supposes they would prove. The refusal to produce books, under a notice, lays the foundation for the introduction of secondary evidence. It affords neither presumptive nor *prima facie* evidence of the fact sought to be proved by them. A party cannot infer from the refusal to produce books which have been called for, that if produced they would establish the fact which he alleges they would prove. The party in such a case may give secondary evidence of the contents of such books or papers; and if such secondary evidence is vague, imperfect, and uncertain as to dates, sums, boundaries, &c., every intendment and presumption as to such particulars shall be against the party who might remove all doubt by producing the higher evidence. Life and Fire Insurance Co. N. Y. *v.* Mech. Fire Insurance Co. 7 Wend. 33, 34.

All inferences shall be taken from the inferior evidence most strongly against the party refusing to produce; but the refusal itself raises no presumption of suspicion or imputation to the discredit of the party, except in a case of spoliation or equivalent suppression. There the

Hanson et al. v. Eustace's Lessee.

rule is that *omnia præsumantur contra spoliatorem.* In other words, with the exception just mentioned, the refusal to produce books or papers upon notice is not an independent element from which any thing can be inferred as to the point which is sought to be proved by the books or papers. Nor can any views of policy growing out of the refusal be associated with the secondary evidence to enlarge the province of the jury, to infer or presume the existence of the fact to which that evidence relates. For considerations of policy, being the source, origin, and support of artificial presumptions, having no application to conclusions as to actual matter of fact, the finding of a jury in conformity with such considerations, and not according to their actual conviction of the truth, resolves itself into a rule or presumption of law.

Apply these principles to the instruction, and we find that the court, under a notice at common law to produce books and papers, and the refusal to produce them, without any other foundation having been laid to permit secondary evidence to be given of the existence of a deed which had not been specifically called for, and the destruction or loss of which had not been alleged, permitted the plaintiff to give secondary evidence that a deed had been made, and upon his failure to do so, instructed the jury that it " must not be supposed that the only effect of the suppression or keeping back books and papers is to admit secondary evidence of their contents, or that the jury are confined, in presuming their contents, to what is proved to have been contained in them. A jury may presume as largely as a chancellor may do, when he acts on his conscience as a jury, does and ought to do, and on the same principles." And further, after reciting the evidence which the court thought led to its conclusion, the court says, " upon such evidence we would, as a court of equity, hold that there was such a clear equitable title in the firm, that Robert Phillips or his heirs were bound on every principle of justice, conscience, and equity to make a conveyance, so as to make the title a legal one." To which the court adds, " when it appears that the members of the new firm had conveyed it in trust for creditors, as their joint property, that the grantees had accepted the conveyance and sold the property under the assignment, that the purchaser from them had accepted a deed reciting theirs and no other title, we cannot hesitate as judges in a court of law, in instructing you that you may presume that such a conveyance from Robert Phillips or his heirs has been made, as they were bound in equity and good conscience to make." " Legal pre-

sumptions do not depend on any defined state of things; time is always an important, and sometimes a necessary ingredient in the chain of circumstances on which the presumption of a conveyance is made; it is more or less important according to the weight of the other circumstances in evidence in the case. Taking, then, all in connection, and in the total absence of all proof of any adverse claim by Robert Phillips or his heirs, from 1832, every circumstance is in favour of the presumption of a conveyance." And the instruction finally concludes with this direction: "As, however, this is a matter entirely for your consideration, we leave it to your decision with this principle of law for your guide, that on a question whether a conveyance shall be presumed or not, the jury are to look less to the direct evidence of the fact than to the reasons and policy of the law, in authorizing them to infer that it was made, if the party who was in possession of the legal title was bound in equity to convey to the real, true, and equitable owner. This legal presumption is not founded on the belief, alone, that the fact existed, but much more on those principles which enforce justice and honesty between man and man, and tend to the security of possessions which have remained undisturbed. Should your opinion be in conformity with ours on this point, you will presume that there was a deed from Robert Phillips or his heirs, competent to vest the title to the Sixth street lot in the firm of Robert and Isaac Phillips, that it so remained at the time of the assignment, and that it was by such conveyance as would enable them to enjoy the property against Robert Phillips and his heirs."

Supposing, then, the term legal presumption to have been used in its known professional sense, it is obvious that the court did not mean it to be one that was absolute and conclusive, but one of law and fact. If the latter, we have already said such a presumption did not arise under the evidence, and the conclusion must be that the construction did not leave the jury to presume, from the evidence alone, that a conveyance had been made of the Sixth street property by Robert Phillips, which vested the legal title to it in the late firm of R. and I. Phillips. We think the exception taken to these instructions must be sustained, and direct the judgment to be reversed.

In the consideration of this case, the court has not forgotten that there were many other points in the cause which were argued with great learning and ability. The court, however, abstains from

noticing them and directs that its opinion should be exclusively confined to the instructions which have been considered.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, It is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby reversed, with costs; and that this cause be, and the same is hereby remanded to the said Circuit Court, with directions to award a *venire facias de novo*.